Ambrose L. SYKES, Defendant Below, Appellant,

v.

STATE of Delaware, Plaintiff Below, Appellee.

Nos. 519, 2006, 556, 2006.

Supreme Court of Delaware.

Submitted: Dec. 19, 2007.

Decided: Jan. 24, 2008.

Christopher D. Tease, Wilmington, DE and Thomas D. Donovan, Dover, DE, for appellant.

John Williams, Department of Justice, Dover, DE, for appellee.

Before STEELE, Chief Justice, HOLLAND, BERGER, JACOBS and RIDGELY, Justices, constituting the court en banc.

STEELE, Chief Justice:

Ambrose L. Sykes, appellant, appeals his Superior Court convictions of two counts of Murder First Degree, two counts of Rape First Degree, and various other felony and misdemeanor offenses. Sykes was sentenced to death by lethal injection. Sykes makes six arguments on appeal. First, Sykes argues that the trial judge infringed his *Fifth Amendment* right to remain silent when he erroneously instructed the jury during the *guilt phase* that allocution would follow closing arguments. Second, Sykes asserts that the State improperly used its peremptory challenges based on race and thereby denied his right to an impartial jury. Third, he contends that the trial judge erred by denying his motion for a change of venue. Fourth, Sykes argues that the trial judge erred when he failed to order a new trial after a witness improperly contacted two members of the jury after the guilt phase and before the penalty phase of his trial.

Finally, Sykes argues that his death sentence should be set aside for two reasons: first, because death by lethal injection violates the *Eight Amendment's* prohibition against cruel and unusual punishment; and, second, because his death sentence is disproportionately severe compared to other similar cases. Because the cruel and unusual punishment argument was not properly raised before the trial judge and because Sykes has alternate means of asserting this claim in Superior Court, we do not consider that argument here. Because we find no error on the remaining issues, we **AFFIRM.**

### *FACTS AND PROCEDURAL HISTORY*

On November 8, 2004, sixty-eight year old Virginia Trimnell was scheduled to fly from Washington, D.C. to Detroit to visit her daughter. When Trimnell did not arrive as scheduled, her daughter contacted the Dover Police Department. Officer Jeffrey Gott went to check on Trimnell. Gott testified that when he arrived at Trimnell's apartment, it was tidy and undisturbed and observed no signs of forced entry. He also testified that he saw two shopping bags sitting on the bed. However, he could not locate Trimnell's car or purse.

At approximately 3:30 a.m. on November 10, 2004, Dover Police Sergeant Timothy Mutter saw Trimnell's car traveling on Kings Highway in Dover. The driver, later identified as Sykes, got out of the vehicle, and Mutter asked him for his license and registration. Sykes initially complied but then fled after Mutter asked about Trimnell. The police could not apprehend Sykes that night.

Police found Sykes's fingerprints on a shovel and a rubber glove inside Trimnell's car. The police also found three gas cans and women's clothing that matched what others saw Trimnell wearing on the day she disappeared. In the trunk of the vehi-

cle, police found a large green suitcase with Trimnell's name and Trimnell's purse inside a green duffel bag. Police found Trimnell's body stuffed into the large green suitcase.

An autopsy indicated that Trimnell died by strangulation. A sexual assault kit detected sperm in Trimnell's vagina. The autopsy did not, however, reveal any defense wounds on Trimnell. DNA testing was conducted. Sykes's saliva reference sample was ultimately determined to match all sixteen loci from Trimnell's vaginal swab. Sykes's DNA also matched the sperm located on a comforter found in Trimnell's truck.

Police seized a computer during a search of Trimnell's apartment. An examination of that computer revealed that it had been used to access pornographic websites on November 7, 2004. Trimnell's credit cards had been used to access the website. That computer had not been previously used to visit similar websites. Police also seized two pornographic magazines and four computers from Sykes's mobile home. Files on two of those computers contained "similar images of adult pornography" to those found on Trimnell's computer. Additionally, police found a leather bag containing silver dollars in the home of Sykes's girlfriend, Jenny St. Jean. Trimnell's daughter later identified that bag as Trimnell's.

Trimnell's telephone records revealed that a cell phone registered to Sykes made three calls to her home on the morning of November 7, 2004. Sykes, a night shift restaurant custodian at Dover Downs, did not work on November 7, 2004. He quit this job on November 8, 2004 due to alleged transportation problems. After he quit his job, Dover Downs security cameras showed him leaving the parking lot on November 8, 2004 in Trimnell's car.

Police arrested Sykes on November 29, 2004 and the State later indicted him on two counts of Murder First Degree and other felony and misdemeanor charges. The State later re-indicted him and added two counts of Rape First Degree.

The case proceeded to trial on May 30, 2006. During jury selection, the State used four of its eight challenges to remove members of minority groups from the jury.[1] After three of the first five, and again when four out of the first six, challenges had been exercised against minority venirepersons, Sykes raised a *Batson* challenge. The trial judge found that the prosecutor had offered a race-neutral reason for each of the peremptory challenges. Consequently, the trial judge determined that the State had discharged its burden of proof as required under *Batson*. The empaneled jury found Sykes guilty on all charges.

Following announcement of the verdict on June 27, 2006, the trial judge instructed the jury to return on June 29. During the evening of June 27, two of the jurors came into contact with St. Jean, Sykes's girlfriend, at a little league park. According to Juror No. 6, St. Jean approached him and asked if he could "donate to the Little League since you ruined my life today." Juror No. 9 also encountered St. Jean, but told her that "I can't talk to you" and walked away from her. No. 9 told the trial judge that St. Jean did not say anything to her. Both of the jurors notified the trial judge what had happened. St. Jean denied having any contact with the jurors.

---

**1.** After the State had exercised three of the first five peremptory challenges against minority veniremembers, Sykes raised a *Batson* claim. Sykes raised another *Batson* claim following the State's sixth peremptory challenge, against a fourth minority veniremember. When the State had announced it was content, it had used eight peremptory challenges in total, four of which were against minority veniremembers.

After interviewing both jurors, the trial judge concluded that No. 6 could remain fair and impartial and allowed him to remain on the jury. The trial judge dismissed No. 9 after she expressed her fear of St. Jean. At the penalty phase, the jury recommended a sentence of death by a unanimous vote. The trial judge sentenced Sykes to death by lethal injection. Sykes's automatic and direct appeals followed.

In our initial opinion, we found that the trial judge made an incomplete *Batson* analysis.[2] We remanded to the trial judge to make factual findings regarding the presence or absence of discriminatory intent, *i.e.,* to determine the totality of the circumstances regarding the challenges and to assess the credibility of the prosecutor's race neutral explanations.[3] On remand, the trial judge concluded that the prosecutors had provided credible, plausible, and race-neutral reasons for each of the peremptory challenges that removed minority panelists from the jury and that the challenges were not a pretext for racial discrimination.[4]

---

2. 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

3. *Sykes v. State*, Del.Supr., No. 516 & 556, 2006, Holland, J (Aug. 30, 2007).

4. *State v. Sykes*, Del.Super. Ct., No. 0411008300, (October 30, 2007).

5. Sykes's conclusory assertion that his rights under the Delaware Constitution have been violated results in his waiving the state constitutional law aspect of this argument. *See Ortiz v. State*, 869 A.2d 285, 291, n. 4 (Del. 2005).

6. Supr. Ct. R. 8.

7. 11 *Del. C.* § 4209(f) provides:
 Punishment of death shall, in all cases, be inflicted by intravenous injection of a substance or substances in a lethal quantity sufficient to cause death and until such

## ANALYSIS

### 1. Eighth Amendment Argument

■ Sykes argues for the first time on appeal that his death sentence should be commuted because death by lethal injection constitutes cruel and unusual punishment under the United States and Delaware Constitutions.[5] He seeks a remand to the Superior Court for an evidentiary hearing to determine the impact Delaware's method of lethal injection may have on a defendant. This Court will not consider any question not fairly presented to the Superior Court unless the interests of justice so require.[6]

■ Section 4209(f) of the Delaware Criminal Code prescribes the method of carrying out a death sentence in Delaware.[7] We have previously upheld the constitutionality of lethal injection as a form of execution.[8] Further, it is presumed that the Department of Correction will properly perform its duties in carrying out an execution procedure.[9]

The United States Supreme Court has recently granted *certiorari* and heard ar-

---

person sentenced to death is dead, and such execution procedure shall be determined and supervised by the Commissioner of the Department of Correction.

8. *See State v. Deputy*, 644 A.2d 411, 421–22 (Del.Super.1994) (analyzing the "evolving standards of decency" standard and concluding that "lethal injection does not violate either the Supremacy Clause or Eighth Amendment of the United States Constitution ... [or] Article I, Section 11 of the Delaware Constitution"), *aff'd*, 648 A.2d 423 (Del.1994) (Table).

9. *See State v. Bailey*, 1991 WL 190294, at *19 (Del.Super.) (finding that the defendant carries the burden of persuasion to "overcome the presumption that the Department of Correction will properly carry out an execution procedure which conforms to the requirements of the Eighth Amendment"), *aff'd* 609 A.2d 668 (Del.1992) (Table).

gument to determine whether the combination three drug protocol used in executions by lethal injection violates the *Eighth Amendment's* proscription of "cruel and unusual punishment."[10] However, Sykes did not present this issue to the trial judge. The United States Supreme Court has this issue under consideration. Their decision may control the issue irrespective of anything we might say about the *Eighth Amendment* today. Further, Sykes may seek post conviction relief after this mandate returns to the Superior Court on any claim under the Delaware Constitution about the propriety of the lethal injection procedure in Delaware. Accordingly, because Sykes still has several avenues available to protect his *Eight Amendment* and his Delaware constitutional rights, and because he did not properly raise *Eight Amendment* issues before the trial judge in the first instance, we decline to address those issues in this Opinion.

### 2. *Fifth Amendment Violation*

 Sykes contends that the trial judge violated his *Fifth Amendment* right to remain silent when he informed the jury before closing arguments during the guilt phase that Sykes would have an opportunity to allocute. The trial judge denied Sykes's motion for a mistrial. We review a trial judge's denial of a motion for a mistrial for abuse of discretion because the trial judge "is in the best position to assess the risk of any prejudice resulting from trial events,"[11] "A mistrial is appropriate only where there are no meaningful and practical alternatives to that remedy."[12] To the extent that the claim alleges an infringement of a constitutionally protected right, we review *de novo*.[13]

 "The United States Supreme Court stated that the 5th and 14th Amendments forbid comment by the prosecutor on the accused's silence or instructions by the Court that such silence is evidence of guilt."[14] In evaluating claims of impermissible comment on the defendant's right to remain silent, the comment "must be examined in context."[15] These claims may be asserted if they arise from actions of a prosecutor or a trial judge.[16] We have

---

10. *See Baze v. Rees,* —— U.S. ——, 128 S.Ct. 34, 168 L.Ed.2d 809 (2007), *as amended* —— U.S. ——, 128 S.Ct. 372, 169 L.Ed.2d 256 (2007), *available at* http://www.supremecourtus.gov/qp/07–05439qp.pdf.

11. *Brown v. State,* 897 A.2d 748, 752 (Del.2006); *Smith v. State,* 913 A.2d 1197, 1223 (Del.2006). *See also Flowers v. State,* 858 A.2d 328, 332–333 (Del.2004) ("Although Flowers seeks *de novo* review to determine whether an error of law occurred that affected his substantial rights, we review the trial judge's denial of Flower's motions for a mistrial and for a new trial for abuse of discretion. In so doing, we also consider the extent to which the trial judge's instruction to the jury to disregard the reference to previous 'jail' time served by Flowers cured any unfair prejudice.").

12. *Guy v. State,* 913 A.2d 558, 565 (Del.2006) (internal quotation marks and citations omitted).

13. *See Williamson v. State,* 707 A.2d 350, 354 (Del.1998) (reviewing for abuse of discretion the question concerning the admissibility of evidence and reviewing de novo the contention that the Sixth Amendment right to confrontation was violated).

14. *Boyer v. State,* 436 A.2d 1118, 1123 (Del. 1981); *see Griffin v. California,* 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965).

15. *U.S. v. Robinson,* 485 U.S. 25, 33, 108 S.Ct. 864, 99 L.Ed.2d 23 (1988).

16. *Richards v. State,* 865 A.2d 1274, 1279 (Del.2004) ("In this case, we hold that same 'context' principle established in [*U.S. v. Robinson,* 485 U.S. 25, 108 S.Ct. 864, 99 L.Ed.2d 23 (1988) ] for judicial review of comments by prosecutors, also applies to comments about the defendant's silence that are made by a judge who conducts a bench trial.").

held that the comment "must be uninvited, must create an improper inference of guilt, and must be prejudicial" to constitute reversible error.[17]

▮ Before closing arguments during the guilt phase, the trial judge told the jury:

> Members of the jury, at this time the State and defense have rested their cases. It is typically the time at which you will now hear closing arguments of counsel. We'll first begin by hearing from the prosecution. Then you'll hear from the defense. And as you know from earlier instructions that were given to you, the State has a further opportunity to respond to the defense's statements. *You also may be hearing from the defendant if he chooses to do what we call an allocution. It's entirely up to the defendant, and you may hear about that as we proceed.*

Counsel did not object at the time. After the State made its closing argument, the trial judge then ordered a recess and called counsel to chambers. He notified counsel of his misstatement and asked whether the parties wanted him to issue any type of clarification. At the conference, Sykes's counsel moved for a mistrial, and the trial judge denied that motion with leave to renew the motion in writing.[18] After further discussion with the attorneys, the trial judge determined that he would provide a curative instruction. Upon returning to the courtroom, he instructed the jury as follows:

> I want to clarify one thing because I misspoke. I want to make sure you understand where we are in these proceedings. I actually told you the State

would make closing remarks, which [the Prosecutor] did on behalf of the State; that you next would hear from [Defense counsel], who would speak on behalf of the defendant; and then, of course, we'll have another opportunity for the State, according to our rules, the State would have a right to add any rebuttal they wish to make. And then the matter will close at that point, and then I will give you the instructions that you will follow for this case at this stage of the proceedings. Anything else I said is not important for you to know other than the fact that you need to also understand that the defendant in this case has a right to testify or not testify as he chooses, and the defendant has chosen not to testify in the case-in-chief for the defense. And the fact that the defendant has elected not to testify must not be considered by you as indication that the defendant is guilty of the crime charged. I gave you this instruction already. I'm going to give it to you, and you'll hear it again when I do full-blown instructions which I'll give you after the State has had an opportunity to do its rebuttal. And the fact that the defendant has chosen not to testify will not be considered by you as an indication that the defendant is guilty of the crime charged or any applicable related offense or for any other purpose, for that matter. And you must not discuss it or consider it during your deliberations. I specifically instruct you that you may not consider the defendant's election not to testify in determining whether the State has established an element or offense beyond a reasonable doubt. Normally [sic],[19] you would spec-

---

17. *Id.*

18. Defense counsel renewed the mistrial motion again before the jury announced its verdict and at Sykes's penalty hearing. The trial judge denied both motions.

19. This appears to be a typographical error. The judge is supposed to say "nor may you speculate," not "normally you would speculate."

ulate as to what the defendant might have said had he exercised his right to testify during the trial. Like any other person charged with an offense, this defendant is presumed innocent until proven guilty beyond a reasonable doubt.

■ A defendant has no right of allocution during closing arguments in the guilt phase. Therefore, the trial judge erred when he informed the jury that the defendant would have a right to allocute when no such right existed at that point in the proceedings. Recognizing his error, the trial judge issued a curative instruction informing the jury that it could not consider the defendant's decision not to testify as evidence of guilt. According to the trial judge, before making that comment, the jury was previously aware that Sykes had the right to testify but had chosen not to do so. The trial judge instructed the jury not to draw any adverse inference from Sykes's decision not to testify. The trial judge chose not to mention allocution again "so as not to draw to the jury additional attention to the word, since it is a word of 'legal art,' and the jury would most likely not be familiar with the term."[20]

■ The curative instruction was a "meaningful and practical alternative" to a mistrial. "Error can normally be cured by the use of a curative instruction to the jury, and jurors are presumed to follow those instructions."[21] Although neither party invited the reference to allocution, the comment did reflect on the defendant's failure to testify during the guilt phase. But, it was not prejudicial in light of the curative instruction that was given. The

trial judge told the jury he misspoke and specifically instructed the jury to not consider Sykes's silence as evidence of guilt. After examining all of the trial judge's statements in context, we conclude that the trial judge properly denied the motion for mistrial.

### 3. *Impartial Jury*

■ Sykes next claims that the State denied his right to an impartial jury when the State improperly used its peremptory challenges to exclude jurors based on race. Sykes notes that the State used four of its first six peremptory challenges to strike minority venirepersons. "We review *de novo* whether the prosecutor offered a race-neutral explanation for the use of peremptory challenges."[22] "If we are satisfied with the race-neutrality of the explanation, we apply a more deferential standard of review to the trial court's ultimate conclusions regarding discriminatory intent. The record of the trial court's credibility determinations ... and the trial court's findings with respect to discriminatory intent will stand unless they are clearly erroneous."[23]

We initially found that the trial judge's analysis was incomplete under *Batson v. Kentucky*[24] and remanded this case to the trial judge for further elaboration on this issue. Sykes had made a prima facie showing of discrimination based on the State's challenge rate, which required the prosecutor to "articulate a neutral explanation related to the particular case to be

20. *State v. Sykes*, No. 0411008300, at 12 (Del.Super.Ct. Sept. 20, 2006) (Findings After Penalty Hearing).

21. *Guy*, 913 A.2d at 565–66.

22. *Jones v. State*, 938 A.2d 626, 2007 WL 666333, at *3 (Del.Supr.).

23. *Jones v. State*, 2007 WL 4327037, at *4 (Del.Supr.).

24. 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

tried,"[25] the second step of *Batson*. Although the trial judge found that the prosecutor had offered a race-neutral reason for each of his peremptory strikes, he did not any include findings about the credibility of these explanations in light of the "totality of the relevant facts."[26] We remanded to the trial judge to make these factual findings.

On remand, the trial judge analyzed the relevant challenges and the credibility of the prosecutor's explanations for the challenges. The trial judge engaged in the same analysis as recently explained in *Jones v. State*,[27] by considering "the credibility of the prosecutor's representations regarding the challenges, the composition of the jury pool and the peremptory challenges by the State, and [the comparison of] the backgrounds of the challenged panelists against those of similarly empaneled veniremembers who were not challenged."[28]

Four prospective black jurors were challenged by the prosecutor during jury selection in Sykes's trial, Mr. S., Ms. T., Ms. F., and Ms. D.[29] The prosecutor directed his second peremptory challenge to Mr. S., a black male. The prosecutor explained that he exercised this peremptory challenge because Mr. S. had been arrested and convicted of violent crimes, including one for domestic violence.[30] The defense argued that other empaneled jurors had been arrested, but the court found that the records of those jurors were not comparable because the charges had been dropped or involved nonviolent crimes. The trial judge found the prosecutor's explanations reasonable, credible, and race-neutral.

The prosecutor exercised the fourth peremptory challenge against Ms. T., a black female. The prosecutor explained that he challenged Ms. T. because she indicated that she "leaned against imposing the death penalty and that her demeanor prompted [him] to believe that she did not hold the maturity level that [he] desired for a Capital murder case."[31] For example, Ms. T. answered "Four" when asked "Have you formed or expressed any opinion regarding whether or not the defendant in this case should be given the death penalty?"[32] The trial judge found the prosecutor's reasons for dismissing her

25. *Robertson v. State*, 630 A.2d 1084, 1089–90 (Del.1993) (citing *Batson*, 476 U.S. at 98, 106 S.Ct. 1712).

26. *Sykes v. State*, Del.Supr., No. 519 and 556, 2006, at 4–5 (Aug. 30, 2007). *See Dixon v. State*, 673 A.2d 1220, 1224 (Del.1996) (citing *Hernandez v. N.Y.*, 500 U.S. 352, 363, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991)).

27. 2007 WL 4327037 (Del.).

28. *Id.* at *2; *see also Jones v. State*, 938 A.2d 626, 2007 WL 666333 (Del.Supr.) (describing the considerations to be addressed and evaluated on the record in this third step).

29. The State's other four peremptory challenges were for white venirepersons. The State had four peremptory challenges remaining when jury selection was completed.

30. The court noted that the prosecutor conceded that he assumed that the domestic violence charge was directed at a woman.

31. *State v. Sykes*, No. 041100830, at 11 (Del.Super. Oct. 30, 2007).

32. The trial judge explained that each prospective juror was asked during *voir dire* where they fell on a sliding scale of one to ten, with one being the strongest against and ten being the most strongest for the death penalty. Following this question, the trial judge asked whether the prospective juror had formed an opinion regarding Sykes, which called for a "yes" or "no" answer. On the first question, Ms. T. had rated her sentiments toward the death penalty generally as a "5." The trial judge did not excuse her for cause based on these responses.

were based on credible, race-neutral reasons that were not pretextual and not race-related.[33]

■ The State used its fifth peremptory challenge against Ms. F., a black female. During *voir dire*, Ms. F. responded to the question of whether she was involved in working with or treating or supporting victims of violent crimes. Because Ms. F. was a youth rehabilitation counselor, the prosecutor challenged her. He explained that he was "not interested in a juror whose livelihood involves rehabilitation and who does not judge individuals who have committed wrongs." The defense argued that the prosecutor had accepted Alternate Juror No. 2, a white male, who worked as a counselor at a family camp for abused children. The trial judge accepted the prosecutor's assertion that the full-time job of rehabilitating juvenile delinquents differed from counseling abused children for one week per year.

■ The State used its sixth peremptory challenge against Ms. D., a black female. In response to the question of whether she could vote for the death penalty, Ms. D. answered no. The prosecutor also noted that one of the deputy attorney

generals on Sykes's case had also prosecuted several of Ms. D.'s relatives. The court accepted the prosecutor's explanations as non-pretextual.

The trial judge concluded that the prosecutor's peremptory challenges were for credible, plausible, and race-neutral reasons, and not pretexts shadowing racial discrimination. The trial judge also noted that the final jury consisted of three black jurors, a hispanic juror, an Asian juror, and an "other," none of which the State attempted to challenge for cause. The State also had four peremptory challenges that remained unused. The defense conceded that there was no evidence of a policy or practice on the part of the Department of Justice or the individual prosecutors to exclude minorities from juries.

Although Sykes made a prima facie showing under *Batson*,[34] the complete Batson analysis shows no constitutional violation. The expanded record shows that the prosecutor articulated credible race-neutral explanations for each of the State's peremptory challenges. The record supports the trial judge's fact findings that no discriminatory intent motivated the State's peremptory challenges. Accordingly, Sykes's *Batson* claim is without merit.[35]

---

33. The court also noted that the prosecutor had compared Ms. T.'s responses to those of Juror No. 2, who had rated her sentiments toward the death penalty as a "7" but answered "no" to whether she had formed an opinion about the defendant.

34. *Sykes v. State*, No. 519 & 556, 2006, at 3–4 (Del.Supr. Aug. 30, 2007).

35. Defense counsel also takes issue with how the trial judge conducted the *Batson* hearing on remand. We find no abuse of discretion with the trial judge's procedure. In most cases, had this step of the *Batson* analysis taken place during the trial, the credibility of the prosecutor's positions and defense counsel's objections would have been examined by the trial judge on the record at sidebar. Although the "comparative calm of a post-trial

hearing" may pose different circumstances than the "exigencies of being in the midst of trial-like proceedings with a jury venire present in the courtroom," the trial judge's choice of procedure is a matter of discretion. *Gray v. State*, 317 Md. 250, 562 A.2d 1278, 1284 (1989) (finding no abuse of discretion in the refusal of the trial judge to require the prosecutor to testify under oath or permit cross-examination despite other cases where the parties had "proceeded by way of sworn testimony and cross-examination without discussion or complaint"). *See also U.S. v. Garrison*, 849 F.2d 103, 106 (4th Cir.1988) ("A *Batson* inquiry next raises the procedural question as to how the judge is to handle the inquiry. Essentially, is the Judge required to hold an evidentiary hearing or some sort of mini-trial on the merits of the claim? On the

### 4. Change of Venue

Next, Sykes argues that the trial judge erred when he denied Sykes motion for a change of venue. Sykes contends that highly inflammatory and sensationalized media coverage prevented him from receiving a fair trial in Kent County. We review the trial judge's denial of a pre-trial motion for a change of venue for abuse of discretion.[36] "A change of venue will be granted only upon a showing of reasonable probability of prejudice."[37] The showing can be made when the defendant presents "evidence of highly inflammatory or sensationalized pre-trial publicity sufficient for the court to presume prejudice if it finds the publicity to be inherently prejudicial. Short of such a showing, the defendant must demonstrate actual prejudice through voir dire."[38]

The trial judge analyzed the pre-trial publicity concerning Sykes's case and concluded that the articles were "informational" and that Sykes had failed to demonstrate actual prejudice through voir dire. "[D]ue process does not entitle a defendant to a trial by jurors ignorant of all facts surrounding the case."[39] The articles were insufficient for the trial judge to presume prejudice, and actual prejudice was not demonstrated through voir dire. Accordingly, the trial judge did not abuse his discretion when he denied Sykes's motion for a change in venue.

### 5. Improper Contact with Jurors

Sykes argues that the trial judge erred when he did not order a new trial when a witness improperly contacted members of the jury after the guilt phase but before the penalty phase. We generally review denials of motions for a new trial for abuse of discretion.[40]

To succeed on a claim of improper jury influence, a defendant must prove that he was "identifiably prejudiced" by the juror misconduct unless he "can establish the existence of 'egregious circumstances,'—i.e., circumstances that, if

---

whole, we think not."); U.S. v. Roan Eagle, 867 F.2d 436, 441 (8th Cir.1989) ("The nature of the inquiry, although adversarial, does not rise to the level of a mini-trial. Rather, in the context of the Batson inquiry, once the prosecutor has advanced his racially neutral explanation, the defendant should have the opportunity to rebut with his own interpretation. This, however, need not necessarily be a lengthy process. If the trial judge is able to reach a determination on the basis of a short exchange between prosecutor and defense then that is the trial court's perogative [sic]."); U.S. v. Tucker, 836 F.2d 334, 340 (7th Cir.1988) ("[W]e believe that adversarial hearings are the appropriate method for handling most Batson-type disputes.... [W]hile we hold that it is up to the trial judge to decide what procedure is best-suited for a particular case, we trust that the trial judge will utilize an adversarial procedure whenever possible."). But see Goode v. Shoukfeh, 943 S.W.2d 441, 450–452 (Tex.1997) ("As with the opportunity to rebut, we conclude that the trial court should provide the party asserting objections under [Batson] with a reasonable opportunity to conduct cross-examination.").

**36.** Riley v. State, 496 A.2d 997, 1015 (Del. 1985).

**37.** Id. at 1014.

**38.** Id. at 1014–45. See also id. at 1015 n. 22 ("A juror is sufficiently impartial and accordingly unaffected by potentially prejudicial media reports if the juror 'can lay aside his impression or opinion and render a verdict based on the evidence presented in court.' ") (quoting McBride v. State, 477 A.2d 174, 185 (Del.1984)).

**39.** McBride, 477 A.2d at 185.

**40.** Hicks v. State, 913 A.2d 1189, 1193 (Del. 2006); Burkett–Wood v. Haines, 906 A.2d 756, 764 (Del.2006); Taylor v. State, 685 A.2d 349, 350 (Del.1996); James v. Glazer, 570 A.2d 1150, 1156 (Del.1990).

true, would be deemed inherently prejudicial so as to raise a presumption of prejudice in favor of defendant."[41] In the *voir dire* context, "[d]eterminations of juror impartiality are the responsibility of the trial judge who has the opportunity to question the juror, observe his or her demeanor, and evaluate the ability of the juror to render a fair verdict."[42] Consequently, the trial judge's findings are extended great deference.[43]

▮ During the evening after the jury delivered the verdict, Sykes's girlfriend, Jenny St. Jean, approached two of the jurors at a little league game. Juror No. 6 notified the trial judge that St. Jean had approached him and asked him if he could "donate to the Little League since you ruined my life today." Juror No. 9 also notified the trial judge that St. Jean had approached her, that St. Jean did not say anything, and that Juror No. 9 told St. Jean, "I can't talk to you" and walked away from her. The trial judge interviewed both jurors regarding the incident.

Juror No. 6 told the trial judge that he was not in fear of St. Jean and that he could remain impartial. Juror No. 9 admitted that she was fearful for herself and her daughter after the encounter. The trial judge excused No. 9, but not No. 6. Sykes contends that the contact between St. Jean and the two jurors is an egregious circumstance warranting a presumption of prejudice. We disagree.

Only the impartiality of Juror No. 6 is at issue because the trial judge excused No. 9. Juror No. 6 told the trial judge that he

was not worried that St. Jean would do any harm to him and that he could remain impartial. Sykes failed to demonstrate or articulate how he was "identifiably prejudiced" by juror misconduct or that he could establish the existence of "egregious circumstances" warranting a new penalty hearing. Thus, because Sykes failed to meet his burden demonstrating prejudice, the trial judge did not abuse his discretion in evaluating this juror and determining that the juror could remain impartial and complete his duty during the penalty phase.

### 6. *Proportionality of the Death Penalty*

The final issue we must address is whether the Superior Court judge's imposition of the death penalty was disproportionate to the penalty imposed in other cases arising under the Delaware death penalty statute.[44] Review by this Court is statutorily mandated following the imposition of a death sentence.[45] Under 11 *Del. C.* § 4209(g), this Court must independently review a sentence of death to determine whether: (1) the evidence supports, beyond a reasonable doubt, the jury's finding of at least one statutory aggravating circumstance; (2) the sentence was arbitrarily or capriciously imposed or recommended; and (3) the sentence is disproportionate to the penalty imposed in similar cases.[46] In this appeal, Sykes argues that his sentence of death is disproportionate. He does not contest the jury's findings on the statutory aggrava-

---

41. *Massey v. State,* 541 A.2d 1254, 1257 (Del. 1988).

42. *DeShields v. State,* 534 A.2d 630, 636 (Del. 1987).

43. *Id.*

44. *Starling v. State,* 903 A.2d 758, 765 (Del. 2006).

45. 11 *Del. C.* § 4209(g)(2); *Id.* at 762.

46. *Manley v. State,* 918 A.2d 321, 328 (Del. 2007); *Ortiz v. State,* 869 A.2d 285, 306–07 (Del.2005).

ting circumstances.[47]

In Sykes's case, the State alleged, as an applicable statutory aggravating circumstance, that Sykes murdered Virginia Trimnell while committing or fleeing from second degree burglary.[48] The State established this statutory aggravating circumstance beyond a reasonable doubt, as a matter of law, by virtue of Sykes's conviction at trial.[49] The jury unanimously found that the State proved the statutory aggravating circumstance by their verdict on the felony murder count.

The trial judge did not arbitrarily or capriciously impose the death penalty. A judge's decision is not arbitrary and capricious if the decision is "the product of a deliberate, rational and logical deductive process."[50] The trial judge set out his rationale for the sentencing decision in a nineteen page written opinion.[51] In reaching his decision, the trial judge considered the statutory and non-statutory aggravators presented by the State and carefully considered the mitigating evidence presented by Sykes.

The trial judge considered the following aggravating circumstances: the preplanning and viciousness of the rape and murder of the victim in her home; the fact that he committed the murder for pecuniary gain; the evidence that Sykes targeted the victim and planned the murder in advance; the evidence that Sykes terrorized and abused the victim before murdering her and that he murdered the victim in an effort to destroy or conceal evidence that he had burglarized her apartment and raped her; the defendant's potential to be dangerous in the future; the impact on the victim's family and friends; and the fact that the victim was random, innocent, and elderly (68 years old). He balanced those aggravating factors against several mitigating factors, including the lack of guidance as a youth, his lack of a father figure, his relationship with his wife, son, and extended family. The evidence supports the trial judge's determination, consistent with the jury's unanimous recommendation, that the aggravating factors outweighed the mitigating factors. The decision resulted from a deliberate, rational, and logical deductive process.

Finally, we must determine if Sykes's sentence is disproportionate to the penalty imposed in similar cases. In answering this inquiry, we review the "universe" of cases.[52] The "universe" of cases is comprised of those First Degree Murder cases which have included a penalty hearing and in which a sentence of either life or death has become final, without or following a review by this Court.[53]

We have upheld the imposition of the death penalty in several cases involving cruel and outrageous deaths of de-

---

47. *See Starling,* 903 A.2d at 763 ("Starling does not claim that the evidence is insufficient to support the jury's findings that the three statutory aggravators were each proven beyond a reasonable doubt."); *Gattis v. State,* 637 A.2d 808, 821 (Del.1994) ("Gattis does not contest the finding of these two statutory aggravating circumstances.").

48. 11 *Del. C.* § 4209(e)(1)(j).

49. *See Dawson v. State,* 637 A.2d 57, 66 (Del. 1994).

50. *Manley,* 918 A.2d at 329 (quoting *Red Dog v. State,* 616 A.2d 298, 310 (Del.1992)).

51. *State v. Sykes,* No. 0411008300 (Del.Super.Ct. Sept. 20, 2006) (Findings After Penalty Hearing).

52. *See* 11 *Del. C.* § 4209(g)(2)(a).

53. *Starling,* 903 A.2d at 765.

fenseless, helpless persons.[54] Where the victim was elderly and was raped and murdered by strangulation, we have found the death sentence proportionate.[55] We have also upheld death sentences where the murder occurred in the victim's home where the object was to commit another criminal offense such as burglary or robbery,[56] and where the murder has been committed for pecuniary gain.[57] Although Sykes tries to distinguish his case from others where the pecuniary gains were larger, "[t]he presence of pecuniary gain is not necessary . . . for a death sentence to be affirmed."[58] This case fits the pattern of cases where the death penalty has been upheld as proportionate. Accordingly, the trial judge's imposition of a sentence of death for the murder conviction was not disproportionate.

## CONCLUSION

NOW, THEREFORE, IT IS ORDERED that the judgment of the Superior Court is **AFFIRMED.**

## APPENDIX A*

| | |
|---|---|
| Name: | Robert Ashley |
| Criminal ID: | 9605003410 |
| County: | New Castle |
| Sentence: | Life |
| Decision on appeal: | 2006 WL 797894 (Del. Mar. 27, 2006) |

| | |
|---|---|
| Name: | Meri–Ya C. Baker |
| Criminal ID: | 90011925DI |
| County: | New Castle |
| Sentence: | Life imprisonment |
| Decision on appeal: | 1993 WL 557951 (Del. Dec. 30, 1993) |

| | |
|---|---|
| Name: | Jermaine Barnett |
| Criminal ID: | 9506017682 |

54. *See Ortiz v. State,* 869 A.2d 285, 310–11 (Del.2005); *Ploof v. State,* 856 A.2d 539, 547 (Del.2004); *Zebroski v. State,* 715 A.2d 75, 84–85 (Del.1998); *Weeks v. State,* 653 A.2d 266, 273 (Del.1995); *Ferguson v. State,* 642 A.2d 772, 789 (Del.1994); *Dawson v. State,* 637 A.2d 57, 68 (Del.1994); *Gattis v. State,* 637 A.2d 808, 823 (Del.1994); *Red Dog v. State,* 616 A.2d 298, 312 (Del.1992); *Pennell v. State,* 604 A.2d 1368, 1378 (Del.1992).

55. *See Whalen v. State,* 492 A.2d 552, 563 (Del.1985) ("He broke into a house and raped a frail [92 year old] woman, during the course of which he brutally strangled her."); *see Lawrie v. State,* 643 A.2d 1336, 1349 n. 13 ("Although Whalen's death sentence was vacated by this Court, 492 A.2d at 569, the basis for the reversal was the existence of procedural errors during his penalty hearing, and not the propriety of the sentence in light of Whalen's conduct."). *See also Flamer v. State,* 490 A.2d 104, 144 (Del.1983) ("[W]e discern a pattern of death sentences in those cases in our 'universe' involving multiple unprovoked murders of helpless elderly victims, i.e., *Flamer, Deputy, Bailey,* and the rape-murder of the elderly lady followed by her invalid husband's demise in *Whalen*."); *and id.* at 141 (describing *Blount v. State,* 511 A.2d 1030 (Del.1986), where a defendant killed a 68–year–old minister but defendant received only a life sentence recommendation).

56. *See Swan v. State,* 820 A.2d 342, 361–62 (Del.2003); *Norcross v. State,* 816 A.2d 757, 769 (Del.2003); *Weeks,* 653 A.2d at 274.

57. *Ploof,* 856 A.2d at 547; *Swan,* 820 A.2d at 361; *Norcross,* 816 A.2d at 769; *Zebroski,* 715 A.2d at 85; *Ferguson,* 642 A.2d at 789.

58. *Weeks,* 653 A.2d at 274.

* The universe of cases prior to 1991 is set forth in appendices to prior opinions by this Court, and those appendices are incorporated herein by reference. *See, e.g., Lawrie v. State,* Del. Supr., 643 A.2d 1336, 1352–56 (1994).

| | |
|---|---|
| County: | New Castle |
| Sentence: | Life imprisonment |
| Decision on appeal: | 749 A.2d 1230 (Del.2000) |

| | |
|---|---|
| Name: | Hector S. Barrow |
| Criminal ID: | 9506017661 |
| County: | New Castle |
| Sentence: | Life imprisonment |
| Decision on appeal: | 749 A.2d 1230 (Del.2000) |

| | |
|---|---|
| Name: | Tyreek D. Brown |
| Criminal ID: | 9705011492 |
| County: | New Castle |
| Sentence: | Life imprisonment |
| Decision on appeal: | 1999 WL 485174 (Del. Mar. 1, 1999) |

| | |
|---|---|
| Name: | Justin L. Burrell |
| Criminal ID: | 9805012046 |
| County: | Kent |
| Sentence: | Life imprisonment |
| Decision on appeal: | 766 A.2d 19 (Del.2000) |

| | |
|---|---|
| Name: | Luis G. Cabrera |
| Criminal ID: | 9703012700 |
| County: | New Castle |
| Sentence: | Life imprisonment |
| Decision on appeal: | 747 A.2d 543 (Del.2000) |

| | |
|---|---|
| Name: | Luis G. Cabrera |
| Criminal ID: | 9904019326 |
| County: | New Castle |
| Sentence: | Death |
| Decision on appeal: | 840 A.2d 1256 (Del.2004) |

| | |
|---|---|
| Name: | Thomas J. Capano |
| Criminal ID: | 9711006198 |
| County: | New Castle |
| Sentence: | Life |
| Decision on appeal: | 889 A.2d 2006 (Del.2006) |

| | |
|---|---|
| Name: | James B. Clark, Jr. |
| Criminal ID: | 9406003237 |
| County: | New Castle |
| Sentence: | Death |
| Decision on appeal: | 672 A.2d 1004 (Del.1996) |

| | |
|---|---|
| Name: | Charles M. Cohen |
| Criminal ID: | 90001577DI |
| County: | New Castle |
| Sentence: | Life imprisonment |
| Decision on appeal: | No direct appeal taken |

| | |
|---|---|
| Name: | Donald Cole |
| Criminal ID: | 0309013358 |
| County: | New Castle |
| Sentence: | Life |
| Decision on appeal: | 922 A.2d 364 (Del.2007) |

| | |
|---|---|
| Name: | James T. Crowe, Jr. |

Criminal ID: 9508008979
County: New Catle
Sentence: Life imprisonment
Decision on appeal: 1998 WL 736389 (Del. Oct. 8, 1998)

Name: David F. Dawson
Criminal ID: 88K00413DI
County: New Castle (venue changed)
Sentence: Death
Decision on appeal: 637 A.2d 57 (Del.1994)

Name: Byron S. Dickerson
Criminal ID: 90011926DI
County: New Castle
Sentence: Life imprisonment
Decision on appeal: 1993 WL 541913 (Del. Dec. 21, 1993)

Name: Cornelius E. Ferguson
Criminal ID: 91009926DI
County: New Castle
Sentence: Death
Decision on appeal: 642 A.2d 772 (Del.1994)

Name: Donald Flagg
Criminal ID: 9804019233
County: New Castle
Sentence: Life imprisonment
Decision on appeal: No direct appeal taken

Name: Freddy Flonnory
Criminal ID: 9707012190
County: New Castle
Sentence: Life imprisonment
Decision on appeal: 893 A.2d 507 (Del.2006)

Name: Sadiki J. Garden
Criminal ID: 9912015068
County: New Castle
Sentence: Life imprisonment
Decision on appeal: 844 A.2d 311 (Del.2004)

Name: Robert J. Garvey
Criminal ID: 0107010230
County: New Castle
Sentence: Life imprisonment
Appeal: 873 A.2d 291 (Del.2005)

Name: Robert A. Gattis
Criminal ID: 90004576DI
County: New Castle
Sentence: Death
Decision on appeal: 637 A.2d 808 (Del.1994)

Name: Arthur Govan
Criminal ID: 92010166DI
County: New Castle
Sentence: Life imprisonment
Decision on appeal: 1995 WL 48359 (Del. Jan. 30, 1995)

Name: Tyrone N. Guy
Criminal ID: 0107017041
County: New Castle
Sentence: Life imprisonment
Decision on appeal: 913 A.2d 558 (Del.2006)

Name: Jason Anthony Hainey
Criminal ID: 0306015699
County: New Castle
Sentence: Life imprisonment
Appeal: 878 A.2d 430 (Del.2005)

Name: Akbar Hassan–El
Criminal ID: 010701704
County: New Castle
Sentence: Life imprisonment
Decision on appeal: 911 A.2d 385 (Del.2006)

Name: Robert W. Jackson, III
Criminal ID: 92003717
County: New Castle
Sentence: Death
Decision on appeal: 684 A.2d 745 (Del.1996)

Name: Larry Johnson
Criminal ID: 0309013375
County: New Castle
Sentence: Life imprisonment
Decision on appeal: 878 A.2d 422 (Del.2005)

Name: David Jones
Criminal ID: 9807016504
County: New Castle
Sentence: Life imprisonment
Decision on appeal: 798 A.2d 1013 (Del.2002)

Name: Michael Jones
Criminal ID: 9911016309
County: New Castle
Sentence: Life imprisonment
Decision on appeal: —— A.2d —— (Del. Dec. 12,2007)

Name: Michael Keyser
Criminal ID: 0310021647
County: Kent
Sentence: Life imprisonment
Decision on appeal: 893 A.2d 956 (Del.2006)

Name: David J. Lawrie
Criminal ID: 92K03617DI
County: Kent
Sentence: Death
Decision on appeal: 643 A.2d 1336 (Del.1994)

Name: Thomas M. Magner
Criminal ID: 9509007746
County: New Castle
Sentence: Life imprisonment
Decision on appeal: 1998 WL 666726 (Del. July 29, 1998)

Name: Michael R. Manley
Criminal ID: 9511007022
County: New Castle
Sentence: Death
Decision on appeal: 918 A.2d 321 (Del.2007)

Name: Frank W. Moore, Jr.
Criminal ID: 92S03679DI
County: Sussex
Sentence: Life imprisonment
Decision on appeal: 1994 WL 202289 (Del. May 9, 1994)

Name: Adam Norcross
Criminal ID: 0002006278A
County: Kent
Sentence: Death
Decision on appeal: 816 A.2d 757 (Del.2003)

Name: Juan Ortiz
Criminal ID: 0104013797
County: Kent
Sentence: Death
Decision on appeal: 869 A.2d 285 (Del.2005)

Name: Jack F. Outten
Criminal ID: 92000786DI
County: New Castle
Sentence: Death
Decision on appeal: 650 A.2d 1291 (Del.1994)

Name: Darrel Page
Criminal ID: 9911016961
County: New Castle
Sentence: Life imprisonment
Decision on appeal: 934 A.2d 891 (Del.2007)

Name: James W. Perez
Criminal ID: 93001659
County: New Castle
Sentence: Life imprisonment
Decision on appeal: No. 207, 1993, Moore, J. (Del. Feb. 3, 1994)

Name: Gary W. Ploof
Criminal ID: 0111003002
County: Kent
Sentence: Death
Decision on appeal: 856 A.2d 539 (Del.2004)

Name: James Allen Red Dog
Criminal ID: 91001754DI
County: New Castle
Sentence: Death (judge only)
Decision on appeal: 616 A.2d 298 (Del.1992)

Name: Luis Reyes
Criminal ID: 9904019329
County: New Castle
Sentence: Death

| | |
|---|---|
| Decision on appeal: | 819 A.2d 305 (Del.2003) |

| | |
|---|---|
| Name: | James W. Riley |
| Criminal ID: | 0004014504 |
| County: | Kent |
| Sentence: | Life imprisonment |
| Decision on appeal: | 2004 WL 2085525 (Del. Oct. 20, 2004) |

| | |
|---|---|
| Name: | Jose Rodriguez |
| Criminal ID: | 93001668DI |
| County: | New Castle |
| Sentence: | Life imprisonment |
| Decision on appeal: | 1994 WL 679731 (Del. Nov. 29, 1994) |

| | |
|---|---|
| Name: | Richard Roth, Jr. |
| Criminal ID: | 9901000330 |
| County: | New Castle |
| Sentence: | Life imprisonment |
| Decision on appeal: | 788 A.2d 101 (Del.2001) |

| | |
|---|---|
| Name: | Reginald N. Sanders |
| Criminal ID: | 91010161DI |
| County: | New Castle |
| Sentence: | Life imprisonment |
| Decision on appeal: | 585 A.2d 117 (Del.1990) |

| | |
|---|---|
| Name: | Nelson W. Shelton |
| Criminal ID: | 92000788DI |
| County: | New Castle |
| Sentence: | Death |
| Decision on appeal: | 652 A.2d 1 (Del.1995) |

| | |
|---|---|
| Name: | Steven W. Shelton |
| Criminal ID: | 92000787DI |
| County: | New Castle |
| Sentence: | Death |
| Decision on appeal: | 650 A.2d 1291 (Del.1994) |

| | |
|---|---|
| Name: | Donald J. Simmons |
| Criminal ID: | 92000305DI |
| County: | New Castle |
| Sentence: | Life imprisonment |
| Decision on appeal: | No direct appeal taken |

| | |
|---|---|
| Name: | Chauncey Starling |
| Criminal ID: | 0104015882 |
| County: | New Castle |
| Sentence: | Death |
| Decision on appeal: | 903 A.2d 758 (Del.2006) |

| | |
|---|---|
| Name: | Brian David Steckel |
| Criminal ID: | 9409002147 |
| County: | New Castle |
| Sentence: | Death |
| Decision on appeal: | 711 A.2d 5 (Del.1998) |

| | |
|---|---|
| Name: | David D. Stevenson |
| Criminal ID: | 9511006992 |
| County: | New Castle |

Sentence: Death
Decision on appeal: 918 A.2d 321 (Del.2007)

Name: Willie G. Sullivan
Criminal ID: 92K00055
County: Kent
Sentence: Death
Decision on appeal: 636 A.2d 931 (Del.1994)

Name: Ralph Swan
Criminal ID: 0002004767A
County: Kent
Sentence: Death
Decision on appeal: 820 A.2d 342 (Del.2003)

Name: Antonio L. Taylor
Criminal ID: 9404018838
County: Kent
Sentence: Life imprisonment
Decision on appeal: 685 A.2d 349 (Del.1996)

Name: Milton Taylor
Criminal ID: 0003016874
County: New Castle
Sentence: Death
Decision on appeal: 822 A.2d 1052 (Del.2003)

Name: Desmond Torrence
Criminal ID: 0205014445
County: New Castle
Sentence: Life imprisonment
Decision on appeal: 2005 WL 2923501 (Del. Nov. 2, 2005)

Name: Charles H. Trowbridge
Criminal ID: 91K03044DI
County: Kent
Sentence: Life imprisonment
Decision on appeal: 1996 WL 145788 (Del. Mar. 4, 1996)

Name: James W. Virdin
Criminal ID: 9809015552
County: Kent
Sentence: Life imprisonment
Decision on appeal: 780 A.2d 1024 (Del.2001)

Name: John E. Watson
Criminal ID: 91008490DI
County: New Castle
Sentence: Life imprisonment
Decision on appeal: No direct appeal taken

Name: Dwayne Weeks
Criminal ID: 92010167
County: New Castle
Sentence: Death
Decision on appeal: 653 A.2d 266 (Del.1995)

Name: Joseph Williams
Criminal ID: 9809018249

County: New Castle
Sentence: Life imprisonment
Decision on appeal: 2003 WL 1740469 (Del. Apr. 1, 2003)

Name: Roy R. Williamson
Criminal ID: 93S02210DI
County: Sussex
Sentence: Life imprisonment
Decision on appeal: 669 A.2d 95 (Del.1995)

Name: Jermaine M. Wright
Criminal ID: 91004136
County: New Castle
Sentence: Death
Decision on appeal: 671 A.2d 1353 (Del.1996)

Name: Craig A. Zebroski
Criminal ID: 9604017809
County: New Castle
Sentence: Death
Decision on appeal: 715 A.2d 75 (Del.1998)