IN THE SUPREME COURT OF THE STATE OF DELAWARE

AMBROSE SYKES § 
 § No. 53, 2014
 Defendant Below, §
 Appellant, § Court Below: Superior Court of
 § the State of Delaware in and for
 v. § Kent County
 §
STATE OF DELAWARE, § Cr. ID. No. 0411008300
 §
 Plaintiff Below, §
 Appellee. §

Submitted: November 19, 2014
Decided: January 30, 2015

Before **STRINE**, Chief Justice, **HOLLAND, RIDGELY, VALIHURA**, and **VAUGHN**, Justices.

Upon appeal from the Superior Court. **AFFIRMED**

Patrick J. Collins, Esquire, (*argued*), Wilmington, Delaware, Albert J. Roop, Esquire, Wilmington, Delaware, Appellant.

John R. Williams, Esquire, (*argued*), Department of Justice, Dover, Delaware, for Appellee.

**VAUGHN,** Justice, for the Majority:

The Movant-Below/Appellant, Ambrose Sykes, appeals the Superior Court's denial of his Motion for Postconviction Relief. In 2006 Sykes was convicted by a jury of two counts of Murder in the First Degree, two counts of Rape in the First Degree, one count of Kidnapping in the First Degree, two counts of Burglary in the Second Degree, and other offenses.[1] After a penalty phase hearing, the trial judge imposed the death penalty. On direct appeal, Sykes' conviction and sentence were affirmed. In this appeal, Sykes asserts five claims. First, he contends that his trial counsel was ineffective in investigating, preparing and presenting mitigating evidence during his penalty-phase hearing; and that the Superior Court in this proceeding committed error in analyzing this claim. Second, he contends that trial counsel was ineffective by failing to argue that an erroneous comment which the trial judge made about allocution during the guilt phase of the trial violated his Sixth Amendment right to a fair trial by an impartial jury; and that the Superior Court in this proceeding committed error by finding that this claim was barred by prior adjudication. In connection with this second claim, Sykes also argues that his appellate counsel was

---

[1] After trial, the two counts of Rape in the First Degree were merged into one count of Rape in the First Degree, and the two counts of Burglary in the Second Degree were merged into one count of Burglary in the Second Degree.

.

ineffective for not arguing this claim on direct appeal. Third, Sykes contends that the trial judge committed error when he failed to remove Juror No. 9 from the jury after her impartiality was called into question during the guilt phase of the trial; that trial counsel was ineffective for not challenging the juror for cause or using a peremptory challenge to strike her during jury selection; that trial counsel was ineffective for failing to argue for her removal from the jury after her impartiality was called into question during the guilt phase of the trial; and that appellate counsel was ineffective for not raising the issue on direct appeal. Fourth, Sykes contends that the State failed to prove Burglary, Rape and Kidnapping beyond a reasonable doubt; that trial counsel was ineffective for not retaining a forensic pathology expert to challenge the medical evidence of homicide; and that appellate counsel was ineffective for not raising on direct appeal the unfairly prejudicial impact these convictions had on the sentencing phase. Fifth, he contends that trial counsel was ineffective for failing to move for a judgment of acquittal on the kidnapping charge on the grounds that the restraint of the victim was incidental to, and not independent of, restraint pertaining to the underlying rape charge. We find no merit to any of these claims and affirm the judgment of the Superior Court.

3

## II. FACTUAL AND PROCEDURAL BACKGROUND[2]

The following is the statement of facts contained in this Court's opinion on direct appeal:

On November 8, 2004, sixty-eight year old Virginia Trimnell was scheduled to fly from Washington, D.C. to Detroit to visit her daughter. When Trimnell did not arrive as scheduled, her daughter contacted the Dover Police Department. Officer Jeffrey Gott went to check on Trimnell. Gott testified that when he arrive at Trimnell's apartment, it was tidy and undisturbed and he observed no signs of forced entry. He also testified that he saw two shopping bags sitting on the bed. However, he could not locate Trimnell's car or purse.

At approximately 3:30 a.m. on November 10, 2004, Dover Police Sergeant Timothy Mutter saw Trimnell's car traveling on Kings Highway in Dover. The driver, later identified as Sykes, got out of the vehicle, and Mutter asked him for his licence and registration. Sykes initially complied but then fled after Mutter asked about Trimnell. The police could not apprehend Sykes that night.

Police found Sykes's fingerprints on a shovel and a rubber glove inside Trimnell's car. The police also found three gas cans and women's clothing that matched what others saw Trimnell wearing on the day she disappeared. In the trunk of the vehicle, police found a large green suitcase with Trimnell's name and Trimnell's purse inside a green duffel bag. Police found Trimnell's body stuffed into the large green suitcase.

An autopsy indicated that Trimnell died by strangulation. A sexual assault kit detected sperm in Trimnell's vagina. The autopsy did not, however, reveal any defense wounds on Trimnell. DNA testing was

---

[2] The facts are taken from the record, our opinion in Sykes' direct appeal, *Sykes v. State* (*Sykes I*), 953 A.2d 261 (Del. 2008), and the Superior Court's postconviction opinion, *Sykes v. State* (*Sykes II*), 2014 WL 619503 (Del. Super. Jan. 21, 2014).

4

conducted. Sykes's saliva reference sample was ultimately determined to match all sixteen loci from Trimnell's vagina swab. Sykes's DNA also matched the sperm located on a comforter found in Trimnell's trunk.

Police seized a computer during a search of Trimnell's apartment. An examination of that computer revealed that it had been used to access pornographic websites on November 7, 2004. Trimnell's credit cards had been used to access the website. That computer had not been previously used to visit similar websites. Police also seized two pornographic magazines and four computers from Sykes's mobile home. Files on two of those computers contained "similar images of adult pornography" to those found on Trimnell's computer. Additionally, police found a leather bag containing silver dollars in the home of Sykes's girlfriend, Jenny St. Jean. Trimnell's daughter later identified that bag as Trimnell's.

Trimnell's telephone records revealed that a cell phone registered to Sykes made three calls to her home on the morning of November 7, 2004. Sykes, a night shift restaurant custodian at Dover Downs, did not work on November 7, 2004. He quit this job on November 8, 2004 due to alleged transportation problems. After he quit his job, Dover Downs security cameras showed him leaving the parking lot on November 8, 2004 in Trimnell's car.

Police arrested Sykes on November 29, 2004 and the State later indicted him on two counts of Murder First Degree and other felony and misdemeanor charges. The State later re-indicted him and added two counts of Rape First Degree.

Jury selection began on May 30, 2006 and continued until June 7, 2006. The guilt phase of the trial began June 9, 2006 and went through June 26, 2006. On June 27, following deliberations, the jury found Sykes guilty on all counts.

5

The penalty phase of the trial took place on June 29 and June 30. The State primarily relied upon the evidence of the facts and circumstances of the crimes of which Sykes was convicted at the guilt phase. It also presented the testimony of a daughter and three close friends of the victim, who gave the jury information about the victim and the impact of the crimes upon her family and friends. The defense presented the testimony of four witnesses: St. Jean (who also testified at the guilt phase of trial as both a State witness and a defense witness); Sykes' mother, Debora Sykes; and two of Sykes' sisters, Debray Sykes and Creshenda Jacobs. St. Jean's testimony focused on a loving relationship among Sykes, St. Jean, and their eleven year old son, and the impact Sykes' execution would have upon their son and her. Debray Sykes discussed her good relationship with her brother and the impact on the family if the death penalty were imposed. Jacobs testified that she had a good relationship with her brother and described the closeness of the relationship between Sykes and his son. Debora Sykes discussed the closeness of the relationship between Sykes and his father, Jesse, when Sykes was a child. She testified that he had a good aptitude as a student and was creative. She also testified about the loving relationship between Sykes and his son. She testified that when Sykes was fourteen, she allowed him to go live with his father because Sykes had a strong desire to do so. She

6

described that decision as a mistake because at the time Jesse was "running the street, running his women, doing his own thing." She testified that while Sykes was with Jesse, Jesse lived with several different women at different times. After two and a half years, Jesse asked Deborah to take him back, which she did. When Sykes returned, she saw that the time with Jesse had really damaged him emotionally, and he was a different kid. She testified that he been exposed to too many things and too much that he should not have been exposed to at his age. When he returned, he did not want to enroll in high school. An effort at Job Corps was unsuccessful. She testified that she and Sykes loved each other and broke down when asked to describe how his receiving the death penalty would impact her.

Sykes did not allocute.

On June 30, 2006, the jury unanimously found beyond a reasonable doubt the existence of a statutory aggravating circumstance: that Trimnell was murdered while Sykes was engaged in the commission of, or flight after committing, Burglary in the Second Degree. The jury recommended a sentence of death by a unanimous vote.

In his report of Findings After Penalty Hearing, the trial judge stated that "Ambrose L. Sykes brutally raped and murdered Virginia Trimmell in her own home and thereafter drove her car with her body in the trunk along with a shovel and gas

cans, in preparation of disposal of the body. One could not describe a more heinous, diabolical crime." He found two additional statutory aggravating circumstances were established beyond a reasonable doubt by the jury's guilty verdicts: the murder was committed while Sykes was engaged in the commission of, or during his flight after committing, Rape in the First Degree; and the murder was committed while Sykes was engaged in the commission of, or during his flight after committing, Kidnapping in the First Degree. The court also found that the following statutory and non-statutory aggravating circumstances were established by a preponderance of the evidence. The victim was over 62 years of age or older and defenseless. The murder was committed for pecuniary gain; specifically, Sykes accessed and used the victim's computer along with her credit card to view a pornographic website, and removed a bag containing silver dollars from her home. The court further found that the victim was targeted and the murder was planned in advance, and that pecuniary gain and preplanning were substantial aggravating circumstances. The court further found that "the act of secreting the body out of the apartment with evidence of the crimes of Murder, Rape and Burglary coupled with the shovel and gas cans provide ample evidence of an effort to destroy or conceal evidence. This is a substantial aggravating circumstance." The trial judge further found that "[t]here is evidence that Sykes did

not know the victim and it does appear that he selected her at random for the purpose of committing the crimes of Rape, Burglary and Murder." He further found that the actions of Sykes were heartless, depraved, cruel and inhuman and that the defendant terrorized and abused the victim before murdering her. He further found that the act of tying up the victim and strangling her with her own clothes and thereafter depositing her in her own suitcase in her own car demonstrated a callous depravity. He also found that "[t]here is no doubt that her loss and the manner of her death will have a substantial, adverse impact on her family and friends." As a final aggravating circumstance, the trial judge found that the defendant was potentially dangerous in the future.

The trial judge found the existence of several mitigating circumstances, including: the "defendant clearly lacked guidance as a youth, in that the lack of a fatherly presence at critical times of his life were a major factor." He further found that "he did not receive timely intervention by his parents during these times, although the Court would note that he had indeed a loving and nurturing mother and sisters who cared about him a great deal." The trial judge further found that he has talent and potential based upon testimony from his mother about his ability as a youth to take a battery and wiring and make a radio. The trial judge further found that he

9

does adjust well in a controlled environment and does not pose any obvious danger to other inmates. The trial judge further found that in "joining his father to live as a youth, despite his mother's justified protesting, he lacked parental guidance and suffered a lack of parental care evidenced by a rambling existence with his father. This experience created a psychological maladjustment for a young man." The trial judge further found that although there was no "strong evidence of the effect of corporal punishment [a fact contradicted by the evidence at the postconviction hearing] and running away from home, his placement by his father at each household where he hung his hat can be equated with a vagabond existence similar to being an abandoned child." The trial judge further found that Sykes had a strong and loving relationship with his son, St. Jean, his siblings, and his mother; and that his "death would negatively impact his mother, son, family and Jenny."

The trial judge summarized his findings as follows: [t]he aggravating factors in this case are serious and substantial. The factual record established by the evidence is overwhelming. The circumstances of the crimes are gruesome and shocking. While there are mitigating factors present, they are not substantial when compared to the aggravating factors." Based on his analysis, the trial judge found that the aggravating circumstances outweighed the mitigating circumstances, and that

10

Sykes should therefore be sentenced to death.

In his automatic, direct appeal to this Court, Sykes raised six claims: (1) the trial judge infringed upon the his Fifth Amendment right to remain silent when the judge erroneously commented to the jury during the guilt phase that Sykes would have the opportunity to allocute following closing arguments; (2) his right to an impartial jury was denied because the State improperly exercised its peremptory challenges on the basis of race; (3) the trial judge erred by denying his motion for a change of venue; (4) the trial judge failed to order a new trial after St. Jean improperly contacted two jurors between the guilt phase and penalty phases of the trial; (5) death by lethal injection constitutes cruel and unusual punishment; and (6) Sykes' death sentence is disproportionately severe compared to other similar cases.[3]

After a remand for additional evidence on the claim that the State improperly exercised its peremptory challenges, this Court rejected all of Sykes' claims on appeal and affirmed his conviction and sentence.

On October 24, 2008, Sykes, represented by new counsel, filed his original Motion for Postconviction Relief. On October 19, 2009, he filed an Amended Motion for Postconviction Relief in which he raised twenty-three separate claims for relief.

_____

[3] *Sykes I*, 953 A.2d at 261.

Beginning October 10, 2011 and concluding November 7, 2012, the Superior Court judge, who was the same judge who presided at trial and imposed sentence, conducted a hearing over the course of eleven days. Testimony was received from twenty-four witnesses. More than forty exhibits were admitted into evidence.

At the hearing, Sykes presented mitigation evidence which he claims should have been, but was not, included in the mitigation case at the sentencing hearing. The additional mitigation evidence was presented through Debora Sykes, Debray Sykes, Creshenda Jacobs, Richelle Herriott, who is Sykes' older sister, Jania Watkins, who is Sykes' younger sister, Dawn Hawkins, who is a former girlfriend who lived with Jesse and Sykes during the above-mentioned two and one-half year period that Sykes lived with Jesse, Tara Whittlesay, who was Dawn's daughter, Yolanda Jones, who taught Sykes when he was in elementary school, Douglas Dyer, a former employer, Dr. Carol Armstrong, a neuropsychologist, and Dr. Craig Haney, a psychology professor. The mitigation evidence describes a traumatic childhood suffered by Sykes, and other mitigating circumstances. A summary of their testimony is as follows:

Debora Sykes, Debray Sykes, Creshenda Jacobs, Richelle Herriott, and Jania Watkins testified that the Sykes had a loving relationship with his son; that Sykes'

household when he was a child was one of little to no means with no real parental presence, particularly by Sykes' father, Jesse; that the neighborhood where the family lived was infested with crime and high drug use, and the family moved from home to home; that during grade school, Sykes attended four different elementary schools due to his family's frequent moves; that Sykes suffered from poor hygiene and often went to school in dirty clothes; that Debora attempted to maintain a strict household and often inflicted corporeal punishment upon her children that at times could be considered harsh; that Sykes would often receive the worst punishment, and the punishment would often leave welts and bruises on his body; that Debora made Sykes' sisters hold him down while she beat him; that on one occasion, while beating him with a belt in this fashion, she opened up a gash near his eye, and he was held home from school while the wound healed; that Jesse was verbally and physically abusive to Debora, often in the presence of the children, and made no attempts to conceal his affairs with other women before ultimately abandoning the marriage; that despite this, Sykes adored his father as a child; that while living with Jesse, Sykes continued to be exposed to his father's sexual relationships and substance abuse; and that Sykes was physically abused by his father.

Dawn testified that Jesse was a heavy drug user, sometimes using drugs while

in Sykes presence; that while Sykes was living with them, Jesse was arrested and convicted on a drug charge; that Jesse was physically abusive toward Dawn, and on one occasion put a gun in her mouth; that Jesse was physically abusive toward Sykes on a frequent basis; that Jesse used drugs in Sykes' presence; that Jesse often stole items while on his job as a moving van driver, and would force Sykes and her to accompany him on the thefts; and that Sykes was aware of his father's criminal and other activities, including seeing his father have sex with another woman.

Tara added that she recalled Jesse's abuse toward Sykes; that she recalled seeing Sykes to the point where his eyes swelled up and he had knots on his head; that Jesse hit Sykes with tennis rackets or whatever other object may have been close by; that Sykes longed for his father's affection, despite the abuse; that Jesse raped her; and that she did not believe that Sykes was sexually abused, but believed he was aware of what his father was doing to her.

Yolanda Jones was a homebound teacher, meaning that she would visit children in their homes to teach them if they were unable to attend school. She described Sykes' neighborhood as one with a high poverty and crime rate. She testified that she often taught Sykes at his home due to a number of chronic illnesses he suffered from as a child; that one home Sykes lived in had no heat, electric or

refrigerator; and that Sykes struggled as a student and had to repeat first and fifth grades.

Douglas Dyer, a former employer, testified that Sykes was a hard worker.

Dr. Carol Armstrong is the director of the neuropsychology lab for the Children's Hospital of Philadelphia. In July of 2009, Dr. Armstrong evaluated Sykes over the course of six hours. Dr. Armstrong found that his abilities meet the range of someone his age, but that Sykes scored statistically lower on memory tests compared to the rest of his evaluation. Dr. Armstrong concluded that Sykes suffered from brain damage in the form of associative memory impairment, which would cause Sykes to be unable to remember new information or learn new things beyond his normal effort. Dr. Armstrong speculated that the physical abuse Sykes suffered as a child was a possible cause of his memory impairment, but could not conclusively state this.

Dr. Craig Haney testified as an expert regarding Sykes' potential behavior in prison. He testified that Sykes would not be a danger to other inmates and would fare well in a controlled prison setting.

Evidence was also produced that Sykes was born cyanotic.[4] After being born at Dover Air Force Base, he had to be rushed to the Philadelphia Naval Hospital because of the condition.

On January 21, 2014, the Superior Court judge issued his written order denying Sykes' motion.

### III. STANDARD OF REVIEW

We review a Superior Court judge's decision to deny postconviction relief for an abuse of discretion.[5] To the extent Sykes raises questions of law or constitutional violations, they will be reviewed *de novo*.[6]

To prevail on a claim of ineffective assistance of counsel, the defendant must satisfy the two-prong standard of *Strickland v. Washington*.[7] This test requires that he prove that trial counsel's performance was objectively unreasonable and that the defendant was prejudiced as a result.[8] Under the first prong, judicial scrutiny is

---

[4] Cyanosis is the appearance of a blue or purple coloration of the skin or mucous membranes due to the tissues near the skin surface having low oxygen saturation.

[5] *Ploof v. State*, 75 A.3d 840, 851 (Del. 2013); *Norcross v. State*, 36 A.3d 756, 765 (Del. 2011).

[6] *Zebroski v. State*, 12 A.3d 1115, 1119 (Del. 2010).

[7] 466 U.S. 668 (1984).

[8] *Id*. at 694.

"highly differential."[9]   Courts must ignore the "distorting effects of hindsight" and proceed with a "strong presumption" that counsel's conduct was reasonable.[10]   The *Strickland* court explained that "a court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct."[11]

Under the second prong, "[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding."[12]   In other words, "not every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding."[13]   "Some errors will have a pervasive effect . . ., and some will have had an isolated, trivial effect."[14]   The movant must show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."[15]   "A

---

[9]  *Id. at 689.*

[10]  *Id*.

[11]  *Id.* at 690.

[12]  *Id.* at 693.

[13]  *Id.*

[14]  *Id.* at 695-96.

[15]  *Albury v. State*, 551 A.2d 53, 58 (Del. 1988) (quoting *Strickland*, 466 U.S. at 694).

17

reasonable probability is a probability sufficient to undermine confidence in the outcome."[16] The court must consider the "totality of the circumstances," and "must ask if the [movant] has met the burden of showing that the decision reached would reasonably likely have been different absent the errors.

With these principles in mind, we turn to Sykes' first contention.

## IV.  DISCUSSION

### The Aggravating and Mitigating Circumstances

Sykes first contends that trial counsel was ineffective in investigating, preparing and presenting mitigating evidence during the penalty-phase hearing.

"When a [movant] challenges a death sentence such as the one at issue in this case, the question is whether there is a reasonable probability that, absent the errors, the sentencer – including an appellate court, to the extent it independently reweighs the evidence – would have concluded that the balance of aggravating and mitigating circumstances did not warrant death."[17] The movant must establish "' a reasonable probability that a competent attorney, aware of the available mitigating evidence, would have introduced it at sentencing,' and 'that had the [sentencer] been confronted

---

[16] *Strickland*, 466 U.S. at 694.

[17] *Id*. at 695.

18

with this . . . mitigating evidence, there is a reasonable probability that it would have returned with a different sentence.' Our inquiry is therefore objective: what a reasonable sentencer in these circumstances would have done when confronted with the evidence."[18] "A careful prejudice inquiry requires us to 'consider *all* the relevant evidence that the [sentencer] would have had before [him] if counsel had pursued a different path."[19] In making that determination, we must consider "the totality of the available mitigation evidence–both [the evidence] adduced at trial, and the evidence adduced in the [postconviction] proceeding"– and "reweigh[] it against the evidence in aggravation."[20]

Prior to trial, defense counsel assigned a law clerk to interview several of Sykes' relatives to search for mitigation evidence. The interviews revealed that Sykes was whipped frequently when he was a child. On more than one occasion, Sykes' mother had one of his sisters hold him down while she, the mother, beat him. A sister remembered one occasion where Sykes' mother hit him in the eye with a belt buckle, causing bleeding and a large contusion. Sykes was not able to see from the eye and

[18] *Swan v. State*, 28 A.3d 362, 391-92 (Del. 2011) (quoting *Wong v. Belmontes*, 558 U.S. 15, 20 (2009)).

[19] *Swan,* 28 A.3d at 392 (quoting *Belmontes*, 558 U.S. at 20).

[20] *Williams v. Taylor*, 529 U.S. 362, 397-398 (2000).

was not able to go to school for about a week. The law clerk wrote a memo to counsel informing him of the results of the interviews. The memo put counsel on notice that there were issues in the Sykes household when Sykes was a child. The memo also discussed educational and behavioral problems. It appears from the record that there was no effort, or no significant effort, by counsel to further investigate the information contained in the memo. This failure by counsel to investigate Sykes' troubled childhood as discussed in the memo, alone, is enough to lead to the conclusion that trial counsel's mitigation case preparation was objectively unreasonable. Thus, we find that Sykes has established the first prong under *Strickland*.

Turning to the second prong of *Strickland*, Sykes contends that the Superior Court erroneously believed that mitigating evidence had to explain or excuse the crime. We agree that the Superior Court's analysis of prejudice does contain error. Instances of that error include the following. While discussing the testimony of a mitigation specialist, the Superior Court stated that the specialist acknowledged that the evidence of Sykes' abuse as a child "has no direct link to why someone would commit murder."[21] While further discussing evidence of abuse, the Superior Court

---

[21] *Sykes II*, 2014 WL 619503, at * 27.

20

stated "the abuse the Petitioner suffered as a child neither compels nor excuses his criminal actions."[22] While discussing Dr. Armstrong's testimony, the Superior Court stated that "Dr. Armstrong also was unable to conclusively state the cause of Petitioner's memory issues, and admitted that this condition would not compel the Petitioner to commit murder."[23]

The error in these comments is that mitigation evidence is not limited to circumstances which might excuse or explain a defendant's criminal conduct. Rather, mitigating evidence is "any factor which tends to make the defendant's conduct less serious or the imposition of a penalty of death inappropriate."[24] Accordingly, mitigation evidence is much broader and a proper focus should allow the sentencer an opportunity to assess the moral culpability of the defendant.[25]

We will now conduct our own independent, *de novo* review of Sykes' claim that trial counsel's failure to investigate, prepare and present the additional mitigation evidence which was presented in this proceeding prejudiced Sykes under the second

---

[22] *Id*. at *28.

[23] *Id*.

[24] *Small v. State*, 51 A.3d 452, 460 (Del. 2012) (quoting *Wright v. State*, 633 A.2d 329, 335 (Del. 1993)).

[25] *Wiggins v. Smith*, 539 U.S. 510, 535 (2003).

21

prong of *Strickland*. With the expanded record in mind, "we now reweigh the evidence in aggravation against the totality of available mitigation evidence and ask whether [Sykes] has shown a reasonable probability that, but for counsel's ineffectiveness, the result of the proceeding would have been different."[26]

The aggravating circumstances which the State presented at trial are extremely strong, powerful aggravating circumstances. Our own independent, *de novo* reweighing of the aggravating circumstances against the totality of the mitigating circumstances leads us to the conclusion that Sykes has not met his burden of showing a reasonable probability that he would have received a different sentence when all of the mitigating circumstances in the reconstructed mitigation record and the aggravating circumstances presented at trial are weighed against each other. Although the additional mitigation evidence presented at the postconviction hearing strengthens the weight of the mitigating circumstances, we find that the aggravating circumstances outweigh the reconstructed mitigating circumstances.

In reaching this conclusion, we have also considered the authorities relied upon by Sykes. In *Williams v. Taylor*, the United States Supreme Court found that the Virginia Supreme Court committed legal error by holding that *Lockhart v. Fretwell,*

---

[26] *Swan*, 28 A.3d at 395 (citations omitted).

506 U.S. 364 (1993), modified or in some way supplanted *Strickland*.[27]  In *Wiggins v. Smith*, the Maryland Court of Appeals found that counsel was not ineffective under the first prong of *Strickland*.  The state court never performed an analysis under *Strickland*'s second prong.  The Supreme Court found that the Maryland Court of Appeals' finding that counsel was not ineffective under the first prong was objectively unreasonable.[28]  In *Rompilla v. Beard*, the Pennsylvania Supreme Court found that counsel was not ineffective under the first prong of *Srickland*.  Having concluded that counsel was not ineffective under the first prong of *Strickland*, the Pennsylvania Supreme Court did not perform an analysis under *Strickland's* second prong.  The Supreme Court of the United States found that the Pennsylvania Supreme Court's finding that counsel was not ineffective under the first prong was objectively unreasonable.[29]  *Outten v. Kearney,* a Delaware case, was another case in which the state court found that counsel was not ineffective under the first prong of *Strickland* and in which no analysis was performed under *Strickland's* second prong. The Third Circuit Court of Appeals found that this Court's finding that counsel was not

---

[27]  *Williams v. Taylor*, 529 U.S. 362, 391 (2000).

[28]  *Wiggins*, 539 U.S. at  527.

[29]  *Rompilla v. Beard*, 545 U.S. 374, 389 (2005).

23

ineffective under the first prong of *Strickland* was objectively unreasonable.[30]  In *Sears v. Upton*, a postconviction trial court in Georgia found that trial counsel's performance was ineffective under the first prong of *Strickland*, but concluded that it could not perform an analysis under the second prong of *Strickland* because it could not speculate as to what the effect of the additional mitigation evidence in that case would be.  It denied the movant's postconviction relief and the Supreme Court of Georgia affirmed.  The United States Supreme Court found that the Georgia state courts committed legal error because they failed to apply the correct prejudice inquiry under *Strickland*.[31]  None of these cases are ones in which the state courts involved found that the defendant had successfully established ineffectiveness under the first prong of *Strickland*, but failed to show prejudice under the second prong after a reweighing of the aggravating circumstances and the reconstructed mitigation circumstances.  They are all distinguishable.

**The Sixth Amendment Claim**

Sykes contends that trial counsel was ineffective by failing to argue that an erroneous comment which the trial court made about allocution during the guilt phase

---

[30]  *Outten v. Kearney*, 464 F.3d 401, 419 (3d Cir. 2006).

[31]  *Sears v. Upton*, 561 U.S.945, 954 (2010).

24

of the trial violated his Sixth Amendment right to an impartial jury; that appellate counsel was ineffective for failing to make the argument on direct appeal; and that the Superior Court in this proceeding committed error by finding that this claim was barred by prior adjudication.

When closing arguments were about to begin during the guilt phase of the trial, the judge made the following comments:

> Members of the jury, at this time the State and defense have rested their cases. It is typically the time at which you will now hear closing arguments of counsel. We'll first begin by hearing from the prosecution. Then you'll hear from the defense. And as you know from earlier instructions that were given to you, the State has a further opportunity to respond to the defense's statements. You also may be hearing from the defendant if he chooses to do what we call an allocution. It's entirely up to the defendant, and you may hear about that as we proceed.

The reference to Sykes and allocution was obviously error since allocution occurs in the penalty phase, not the guilt phase.

Trial counsel did not object when the comments were made. After the State completed its closing, the trial court recessed and met with counsel in chambers. Realizing his error, the trial judge asked whether the parties desired that he issue some form of clarification. Defense counsel then moved for a mistrial, which the court denied. Instead, the trial judge gave the following curative instruction.

> I want to clarify one thing because I misspoke. I want to

25

make sure you understand where we are in these proceedings. I actually told you the State would make closing remarks, which [the Prosecutor] did on behalf of the State; that you next would hear from [Defense counsel], who would speak on behalf of the defendant; and then, of course, we'll have another opportunity for the State, according to our rules, the State would have a right to add any rebuttal they wish to make. And then the mater will close at that point, and then I will give you the instructions that you will follow for this case at this stage of the proceedings. Anything else I said is not important for you to know other than the fact that you need to also understand that the defendant in this case has a right to testify or not testify as he chooses, and the defendant has chosen not to testify in the case-in-chief for the defense. And the fact that the defendant has elected not to testify must not be considered by you as indication that the defendant is guilty of the crime charged. I gave you this instruction already. I'm going to give it to you, and you'll hear it again when I do full-blown instructions which I'll give you after the State has had an opportunity to do its rebuttal. And the fact that the defendant has chosen not to testify will not be considered by you as an indication that the defendant is guilty of the crime charged or any applicable related offense or for any other purpose, for that matter. And you must not discuss it or consider it during your deliberations. I specifically instruct you that you may not consider the defendant's election not to testify in determining whether the State has established an element or offense beyond a reasonable doubt. Normally [sic],[32] you would speculate as to what the defendant might have said had he exercised his right to testify during the trial. Like any other person charged with an offense, this

---

[32] This appears to be a typographical error. The judge is supposed to say "nor may you speculate," not "normally you would speculate."

defendant is presumed innocent until proven guilty beyond a reasonable doubt.

At trial and on direct appeal, Sykes argued that the trial judge's erroneous reference to allocution during the guilt phase violated his Fifth Amendment right to remain silent. This Court concluded that there was no error in the denial of the motion for a mistrial, and that the curative instruction cured any prejudice to Sykes' Fifth Amendment right to remain silent.[33]

Sykes now argues that the trial judge's comment on allocution violated his Sixth Amendment right to an impartial jury because it may have improperly influenced at least one juror, who may have communicated that improper influence to the other jurors.

Having considered Sykes' Sixth Amendment claim, we conclude that the curative instruction was sufficient to cure any prejudice to his Sixth Amendment right to an impartial jury, as well as his Fifth Amendment right to remain silent. Sykes has failed to establish prejudice from his trial counsel's failure to argue at trial or his appellate counsel's failure to argue on direct appeal that the trial judge's comment on allocution prejudiced his Sixth Amendment right to an impartial jury.

---

[33] *Sykes I*, 953 A.2d at 269.

Moreover, we agree with the Superior Court's conclusion that Sykes' Sixth Amendment claim is barred by Superior Court Criminal Rule 61(i)(4). That Rule bars consideration of any ground for relief that was formerly adjudicated, unless reconsideration of the claim is warranted in the interest of justice. A "defendant is not entitled to have a court re-examine an issue that has been previously resolved 'simply because the claim is refined or restated.'"[34] The Sixth Amendment claim which Sykes' now makes adds little of substance to his Fifth Amendment claim made on direct appeal. Although the legal theory has changed, the claim is the same – that the trial judge's allocution comment was prejudicial.

We also find that Sykes has made no showing that reconsideration of the claim is warranted in the interest of justice.

Under Superior Court Criminal Rule 61(i)(5), the bar of Rule 61(i)(4) is inapplicable "to a claim that the court lacked jurisdiction or to a colorable claim that there was a miscarriage of justice because of a constitutional violation that undermined the fundamental legality, reliability, integrity or fairness of the proceedings leading to the judgment of conviction." Sykes' has made no showing

---

[34] *Skinner v. State*, 607 A.2d 1170, 1172 (Del. 1992) (quoting *Riley v. State*, 585 A.2d 719, 721 (Del. 1990)).

that the bar of Rule 61(i)(4) is rendered inapplicable under Rule 61(i)(5).[35]

**Juror No. 9**

Sykes contends that the trial court committed error when it failed to remove Juror No. 9, an African-American juror, after her impartiality was called into question during the guilt phase of the trial; that trial counsel was ineffective for not challenging the juror for cause or using a peremptory strike upon her during jury selection; that trial counsel was ineffective for failing to argue for her removal from the jury after her impartiality was called into question during the guilt phase of the trial; and that appellate counsel was ineffective for not raising the issue on direct appeal.

Since this was a capital murder trial, each prospective juror was individually *voir dired*. During Juror No. 9's *voir dire*, she revealed that she had been a rape victim 10 years earlier, in 1996. Defense counsel requested additional questioning to make sure that she was aware that there was a rape charge involved in this case. Such additional *voir dire* took place. The prospective juror indicated that she could be fair and impartial. When neither party challenged the juror for cause or exercised

---

[35] Sykes also claims that the trial judge's allocution comment was a comment upon the evidence in violation of the Delaware Constitution, Article IV, § 19. Since we find that the curative instruction was sufficient to cure any prejudice to Sykes, no further consideration of this claim is warranted.

a peremptory challenge, she was seated on the jury.

Sykes appears to argue that trial counsel is ineffective for failing to challenge a juror for cause or for not using a peremptory challenge in all cases where a juror is a victim of rape and one of the charges is rape. However, while challenging or striking such a juror is always a safe course for counsel, there is no broad rule that trial counsel must always challenge the juror for cause or use a peremptory challenge. The juror indicated that she could be fair and impartial. She also indicated that she thought the process in her case produced a fair result, and she bore no ill will toward the criminal justice system. There is no evidence in this record that she did not, in fact, carry out her duties as a juror in a fair and impartial manner. We find that Sykes has failed to demonstrate any prejudice from defense counsel's decision to allow Juror No. 9 to be seated.

On the ninth day of the guilt phase of the trial, Jenny St. Jean reported that she had known Juror No. 9 since childhood. At that point, Ms. St. Jean had testified twice during the trial. The juror denied knowing Ms. St. Jean.

The trial judge thoroughly considered this issue and ultimately concluded that Ms. St. Jean's testimony was not credible, that there was no relationship between the two, and that Juror No. 9 was fair and impartial.

To the extent that Sykes directly challenges the trial court's ruling that the juror would remain on the jury, his claim is barred by Superior Court Criminal Rule 61(i)(3). Rule 61(i)(3) bars any claim which was not asserted in the proceedings leading to the judgment of conviction, unless the movant shows cause for relief from the procedural default and prejudice from violation of the movant's rights. Sykes' trial attorneys did not challenge the juror at trial or on appeal. Therefore, any direct claim that the trial judge should have removed the juror from the jury is barred under Rule 61(i)(3).

As to Sykes' claim that trial counsel was ineffective for not arguing for her removal after impartiality was questioned, or raising the issue on appeal, we find that Sykes has failed to establish any prejudice from Juror No. 9's remaining on the jury through the conclusion of the guilt phase, or from appellate counsel's not raising the issue on appeal.[36]

## Forensic Pathology Expert

Sykes contends that the State presented insufficient evidence to prove Burglary, Rape and Kidnapping beyond a reasonable doubt. He contends that the

---

[36] As discussed in this Court's opinion on direct appeal, juror no. 9 was removed from the jury before the beginning of the penalty phase. Juror no. 9 indicated that she felt fearful for herself and her child after St. Jean approached her after the jury delivered its verdict in the guilt verdict.

State failed to show lack of consent in connection with the Rape claim. He also contends that tying the victim in pantyhose did not prove lack of consent because, based on postconviction hearing testimony of Dr. Jonathan L. Arden, M.D., she was tied up after her death for the purpose of transporting the body. He also contends that having Dr. Arden's testimony at trial would have enabled trial counsel to object to the State's arguments such as "having her bound and gagged certainly made raping her a lot easier." He also contends that the State failed to prove the timing of the victim's injuries in relation to sexual intercourse, which means that the State failed to prove, as alleged in Count 3, that Sykes "cause[d] physical injury" to the victim "during the commission of the [rape], during the immediate flight following the commission of the crime, or during the attempt to prevent the report of the crime." He also contends that the State's failure to prove rape means that the State did not prove Burglary in the Second Degree under Count 6 of the indictment, which alleged that Sykes entered the victim's residence with the intent to commit rape. He also contends that there was insufficient evidence of Burglary in the Second Degree under Count 8 because there was no sign of forced entry, and no sign that Sykes entered or remained on the premises unlawfully. He also contends that retaining a forensic pathology expert would have saved trial consel from an ill-conceived line of questioning in which

32

counsel cross-examined Dr. Vershvovsky, the doctor from the Medical Examiner's office who performed the autopsy, about the possibility that the victim was still alive when she was placed in the suitcase, a theory which Dr. Vershvovsky rejected out of hand. He also contends that an expert, such as Dr. Arden, would have advised counsel that the victim was placed in the suitcase after death; that certain scalpine hemorrhages were minor "bump on the head type injuries"; and that the facts were rare for a strangulation case because the scarf was loose around the neck, indicating that the victim was strangled from behind by an upward pulling motion, which, Sykes claims, negates intent. Dr. Arden agreed that the victim died of asphyxiation by strangulation. Sykes also contends that in ruling upon the motion for judgment of acquittal on the Burglary, Rape and Kidnapping charges, the trial judge placed the burden of proof on him. He also contends that appellate counsel was ineffective for not raising the insufficiency of the evidence on the Rape, Burglary and Kidnapping charges as an issue on direct appeal.

At the close of the State's case at trial, the defense moved for a judgment of acquittal on the charges of Rape, Kidnapping and Burglary. The motion was denied by the trial court. We find that his claim made here that there was insufficient evidence of Rape, Burglary and Kidnapping is barred under Superior Court Criminal

33

Rule 61(i)(4) by the trial judge's adjudication of his motion for judgment of acquittal at the close of the State's case. Sykes has made no showing that reconsideration of this prior adjudication is warranted under the interest of justice exception in Rule 61(i)(4) or that the bar is not applicable under Rule 61(i)(5).

Moreover, we also find that Sykes cannot establish prejudice upon his claim that appellate counsel was ineffective for challenging the sufficiency of the evidence of Rape, Kidnapping and Burglary on direct appeal. There was substantial evidence to support Sykes' convictions. Sykes' has failed to establish that there is a reasonable probability that the result would have been different had his appellate counsel argued that the trial judge committed error in denying the motion for judgment of acquittal.

Sykes also contends that his trial counsel was ineffective in failing to retain a forensic pathology expert to challenge the State's evidence of homicide. In addition to detailing the injuries associated with the victim's strangulation, Dr. Vershvovsky testified at trial that scalpine hemorrhages were caused by blunt force trauma. She also testified that there was a hemorrhage to the right wrist, which would be caused by the victim "being either bound or grabbed hard." Dr. Vershvovsky's testimony presented evidence from which the jury could find, as it did, that Sykes "cause[d] physical injury" to the victim "during the commission of the [rape], during the

34

immediate flight following the commission of the crime, or during the attempt to prevent the report of the crime."

At most, Dr. Arden's testimony that the body was bound after death, that the scalpine hemorrhages were minor bumps, and that the facts of the strangulation were rare, creates a mere possibility that the result would have been different as to one of the two Rape charges and the Kidnapping charge if his testimony had been presented at trial. Sykes cannot establish that the jury would have rejected Dr. Vershvovsky's testimony and accepted Dr. Arden's testimony. We find that Sykes has failed to establish that there is a reasonable probability that the result would have been different if Dr. Arden had testified. Sykes has failed to establish prejudice from trial counsel's failure to retain a forensic pathology expert.

### The *Weber* Claim

Finally, Sykes makes an additional argument with regard to the sufficiency of the evidence of Kidnapping in the First Degree. He contends that trial counsel was ineffective for failing to include in his motion for judgment of acquittal on the Kidnapping charge the argument that the restraint of the victim was incidental to, and not independent of, restraint pertaining to the underlying Rape charge.

When kidnapping is charged together with an underlying offense, there must

be evidence that the restraint of the victim must be independent of and not incidental to the underlying offense.[37]  In this case, Sykes was charged with Kidnapping in the First Degree on the grounds that he did "unlawfully restrain Virginia B. Trimmell with the intent to facilitate the commission of the felony of Rape First Degree." According to the autopsy report, the victim's legs were bound together at the ankles with pantyhose, forming a knot.  The pantyhose then trailed upward and wrapped around the right wrist.  As mentioned, Sykes contends, based on the testimony of Dr. Arden, that the binding of the victim occurred after death.  Dr. Arden testified at the postconviction hearing that binding with the stockings occurred after death because if the victim were bound while still alive, there should be bruising where the stockings were tied around her.  He testified that there were no such marks or bruising.

Thus, Sykes contends that trial counsel was ineffective in failing to develop testimony such as that given by Dr. Arden, testimony from which counsel could argue that there was insufficient evidence of the victim being restrained independently of the restraint incidental to Rape.

The jury was properly instructed that the restraint for kidnapping must have

---

[37]  *Weber v. State*, 547 A.2d 948 (Del. 1988).

been independent of and not incidental to Rape. The sequence of events was a factual determination for the jury. In addition, it appears that the stockings tied around the victim's ankles are not the only evidence of restraint. It appears from the cross-examination of Dr. Arden that there were other stockings found in the victim's vehicle which appeared to have been cut. Dr. Arden acknowledged that the hemorrhaging to the wrist occurred while the victim was still alive. As mentioned, Dr. Vershvovsky testified that the scalpine hemorrhages were caused by blunt force trauma. There was circumstantial evidence to support the conclusion that the victim was subjected to restraint in her apartment that was independent of the Rape and done to facilitate the Rape. We find that Sykes has failed to establish that there is a reasonable probability that the result would have been different if trial counsel had retained an expert such as Dr. Arden and argued that the restraint of the victim was incidental to, and not independent of, the Rape.

## CONCLUSION

Accordingly, the judgment of the Superior Court denying Sykes' motion for postconviction relief is **AFFIRMED.**

**STRINE**, Chief Justice, dissenting:

Although I agree with my colleagues that the Superior Court committed no error by affirming Ambrose Sykes' conviction for first degree murder, rape, and kidnapping; that Sykes' trial counsel was ineffective under the first prong of *Strickland*; and that the crime itself was cruel, depraved, and heinous, I respectfully disagree that the lack of effective representation for Sykes at the critical penalty phase of his case caused him no prejudice.

One of the most important duties of a defense counsel in a capital case is to "conduct a thorough investigation of the defendant's background" to obtain mitigating evidence.[38] The attorney investigation is essential because sentencing judges and juries "must be able to give meaningful consideration and effect to all mitigating evidence that might provide a basis for refusing to impose the death penalty on a particular individual. . . ."[39] And it is precisely when the defendant is convicted of a monstrous crime that he is most in need of a powerful, humanizing mitigation presentation. In other words, it is in circumstances such as these, when a defendant commits a cruel and depraved rape and murder of an elderly woman, that

---

[38] *Williams v. Taylor*, 529 U.S. 362, 296 (2000).

[39] 21A Am. Jur. 2d Criminal Law § 894.

it is most vital that his attorney provide mitigation evidence to weigh against the defendant's inexplicably evil behavior and tip the balance towards life in prison. That evidence is essential if counsel is to convince the jury and the judge to give the more merciful of the two harsh sentencing options: natural life in prison without possibility of parole or death by execution.

As my colleagues in the Majority Opinion point out, mitigation evidence is not used to excuse the crime; it is used to provide the sentencing authority with a basis to determine whether the defendant is so morally culpable as to deserve execution. Given the circumstances, evidence of this kind was of obvious importance to representing Sykes effectively. Sykes' trial counsel acknowledged that Sykes did "not have a shot" in the guilt phase. When the jury and the judge are most likely to wonder how or why a person could act in such a vicious and cruel way, that is when the defense counsel's duty to provide an answer in the form of mitigating evidence is most important. Thus, Sykes' trial counsel was bound to take reasonable steps to discover and present all of the factors that could have influenced the jury and the sentencing judge to impose life in prison as the penalty.

The ABA Guidelines, which were in place when defense counsel was assigned to Sykes' case, and which the U.S. Supreme Court has used as a touchstone for

reasonable attorney conduct, state that, "[a]n attorney representing the accused in a death penalty case must fully investigate the relevant facts. . . . [P]roviding quality representation in capital cases requires counsel to undertake correspondingly broad investigation and preparation."[40]    To prepare effectively, the attorney must, at "minimum," hire a professional investigator and a mitigation specialist. "At the same time, counsel must consciously work to establish the special rapport with the client that will be necessary for a productive professional relationship over an extended period of stress."[41]  The Guidelines conclude that the defendant's constitutional right to offer mitigating evidence "does nothing to fulfill its purpose unless it is understood to presuppose that the defense lawyer will unearth, develop, present, and insist on the consideration of those 'compassionate or mitigating factors stemming from the diverse frailties of humankind.'"[42]

The record is clear that Sykes' trial counsel did not attempt to establish any relationship with Sykes. Nor did he investigate Sykes' background at all, such as by

---

[40]  ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, February 2003.

[41]  *Id.*

[42]  *Id.* (quoting Louis D. Bilionis & Richard A. Rosen, *Lawyers, Arbitrariness, and the Eighth Amendment*, 75 Tex. L. Rev. 1301, 1316 (1997) (quoting *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976) (opinion of Stewart, Powell, & Stevens, JJ))).

seeking publicly available records, and he failed to pursue obvious leads, including those discovered by his law clerk.[43]   Despite the fact that this was his first time working as the lead attorney on the sentencing portion of a capital case, Sykes' trial counsel did not hire a mitigation expert or a professional investigator.  For those reasons, I agree with the Majority Opinion that the trial counsel's mitigation case investigation was objectively unreasonable, and that Sykes has established the first prong under *Strickland*.

I part from the Majority Opinion because I would find that the trial counsel's deficient investigation prejudiced Sykes under *Strickland's* second prong.  Because the new mitigating evidence so substantially altered the evidentiary mix, I find that there is a meaningful chance that a reasonable juror would recommend, and the sentencing judge would choose a life sentence in prison instead of execution.[44]

---

[43]  As the Majority Opinion points out, the clerk set forth a number of potential avenues for mitigation, such as severe abuse by Sykes' mother and father, Sykes' educational and behavioral problems, social issues (such as a lack of friends as a child), economic deprivation, brain damage, and a poor relationship with his father.  Sykes' defense attorney did not pursue any of these avenues and did not present the jury with this evidence.

[44]  Under the *Strickland* test, the test of prejudice is whether there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 694 (1984).  "A reasonable probability is a probability sufficient to undermine confidence in the outcome"—a lower standard than "more likely than not." *Id.*  In other words, a reasonable probability exists when there is a meaningful chance that a reasonable juror and judge would have reached a different decision had they been able to consider the omitted mitigation evidence.

As the Majority Opinion acknowledges, the evidence presented during the Rule 61 hearings is very different than the evidence that the jury heard at Sykes' sentencing.  Had Sykes' trial counsel performed a thorough investigation, he would have discovered (and presented the jury with) the following evidence:

> (1)    Sykes experienced severe economic deprivation throughout his childhood.  When he was in elementary school, Sykes' father, Jesse Sykes, was discharged from the military for selling drugs, and after that, there was not enough money "really to eat."
>
> (2)    While living together, Sykes' parents fought constantly, physically and verbally, and they severely injured each other.  Sykes saw  "quite a bit" of the violence.
>
> (3)    Sykes idolized and looked up to his father.  The two were inseparable during Sykes' childhood.  But Sykes' father was not a good role model: he was a drug addict and used drugs in front of his children on a daily basis.  He beat his wife, Sykes' mother, and Sykes' siblings.  He engaged in extramarital affairs and would take Sykes to see his girlfriends, one of whom was only 16.
>
> (4)    After Sykes' father left, his mother frequently moved the family to different public housing projects in impoverished neighborhoods.  Sykes often came to elementary school without shoestrings or socks, in dirty clothes that would need to be laundered on premises.

(5)     Sykes' mother neglected his medical care.  She also beat him, often leaving welts and bruises.  At one point, his mother whipped him as his sisters held him down.  Sykes' mother now receives treatment for mental illness.

(6)     When Sykes was 14, he left his mother's home and moved in with his father and his father's girlfriend, Dawn Hawkins.  Jesse Sykes severely abused Sykes during the two years that he lived in his father's house.  Hawkins testified that Jesse  "punch[ed] on [Sykes]" constantly. Jesse would beat him with belt buckles, tennis rackets, and sticks, leaving Sykes with  "black eyes, bruises, busted lips."

(7)     Sykes was devastated by the severe abuse imposed by the man he idolized.   "Brose spent most of the time in his room crying.  He would constantly cry.  He would get in the bed and put the earphones on and just lay there and cry."

(8)     Jesse Sykes also violently abused his girlfriend and his girlfriend's sister, Tara Whittlesay, who lived in the house with them.  For example, Hawkins recalled that Jesse put a gun in her mouth on one occasion.  Whittlesay testified that Jesse sexually assaulted her from age 11 to 16, while Sykes was living in the home, and that Sykes was aware of this abuse.  Sykes' father was eventually charged with raping Whittlesay.

(9)     Jesse Sykes enlisted his son as an apprentice in his criminal activity during this time.  Sykes would go out on the road with his father to participate in burglaries  "all the time."   Sykes was often forced to witness his father's sexual encounters on these trips.

(10)  Sykes' mother and siblings testified that after

spending two years in his father's house, Sykes changed dramatically. He talked much less and never returned to school.

(11) Sykes suffered from brain damage in the hippocampus, possibly caused by the beatings, malnutrition, and cyanosis at birth.

Sykes' trial counsel did not present any of this evidence to the jury because he did not investigate Sykes' background at all. Instead, at sentencing, he presented testimony from four family members who vaguely stated that Sykes' childhood was "kind of difficult." Sykes' trial counsel also failed to present the only independent evidence that he secured during his cursory investigation: that Sykes suffered from an antisocial personality disorder.[45] Therefore, there was a material difference between the mitigation case the jury heard and the mitigation case a reasonable attorney would have presented.

As the Majority Opinion recognizes, the Superior Court erred in stating that this additional mitigating evidence had to explain or excuse Sykes' crimes to be

---

[45] At oral argument, the State discounted the value of the psychological diagnosis as a mitigating factor, claiming that it could have done more harm than good. But there is no reason to think that the jury would have not been positively influenced by the diagnosis of Sykes as having antisocial personality disorder when combined with the evidence of severe abuse. And the fact that Sykes had antisocial personality disorder has a nexus to the crimes committed by Sykes, which the State admitted is the strongest type of mitigating evidence.

relevant. But the Majority Opinion fails to recognize that the Superior Court also erred in its analysis of whether prejudice occurred. The Superior Court did not ask whether there was a reasonable chance that a reasonable sentencing authority would have given a life sentence if confronted with the new evidence. Instead, the court took a subjective approach, and concluded that it would not have imposed a different sentence. But the test is not whether the trial judge himself would have come to a different conclusion.

The Majority Opinion compounds the trial court's error on appeal. As it did in its recent decision in *Ploof v. State*,[46] this Court mistakes the application of *Strickland's* prejudice prong to this procedural context. Eschewing any reliance on the Superior Court's analysis of whether the prejudice occurs, the Majority Opinion purports to reweigh the aggravating and mitigating factors in the record itself and to reach what appears to be its own sentencing determination. Thus, the Majority Opinion states:

> The aggravating circumstances which the State presented at trial are extremely strong, powerful aggravating circumstances. Our own independent, de novo reweighing of the aggravating circumstances against the totality of the

---

[46] 75A. 3d 840 (Del. 2013).

45

> mitigating circumstances leads us to the conclusion that Sykes has not met his burden of showing a reasonable probability that he would have received a different sentence . . . . Although the additional mitigation evidence presented at the postconviction hearing strengthens the weight of the mitigating circumstances, we find that the aggravating circumstances outweigh the reconstructed mitigating circumstances.

The Majority Opinion's focus on its own assessment of the aggravating and mitigating circumstances is contrary to the intent behind Delaware's hybrid capital sentencing scheme. The U.S. Constitution requires that the sentencing authority always have an option to consider mitigation evidence and to order a sentence less than death if that authority determines that the mitigating evidence outweighs the evidence in favor of imposing a death sentence.[47] In Delaware, the sentencing authority is both the judge and jury. Although our state has diminished the role of the jury in the capital sentencing process, it has not eliminated it. To do so might violate the U.S. Constitution under the Supreme Court's decision in *Ring v. Arizona*, in which the Court invalidated Arizona's capital sentencing process because the

---

[47] *E.g.*, *Eddings v. Oklahoma, 455 U.S. 104, 105 (1982)* ("[W]e conclude that the Eighth and Fourteenth Amendments require that the sentence . . . not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.").

sentencing judge weighed the aggravating and mitigating circumstances necessary to impose death without the aid of a jury.[48] The Delaware capital murder statute contemplates that the jury will play a major role in sentencing by requiring that it unanimously find at least one aggravating factor before the death penalty can be imposed, and then cast an advisory vote on whether the aggravating factors outweigh the mitigating factors.[49] The sentencing judge must give weight to the jury's recommendation, and if she disagrees, she must state her reasons "with specificity."[50] And although the sentencing judge may reach a different judgment from the jury majority, I am not prepared to say that the jury's vote is without any influence at all, especially as a Delaware trial judge has only overridden a jury vote for life once before.[51]

As explained in *Ploof,* the proper application of *Strickland* in this important

---

[48]  536 U.S. 584 (2002); *see also Brice v. State*, 815 A.2d 314 (Del. 2003) (upholding Delaware's hybrid capital sentencing scheme because of the role of the jury in weighing the aggravating and mitigating circumstances).

[49]  11 *Del. C.* § 4209(c).

[50]  11 *Del. C.* § 4209(d).

[51]  *See Garden v. State*, 815 A.2d 327, 345 (Del. 2003), *rev'd and remanded*, *Garden v. State*, 844 A.2d 311 (Del. 2004); *see also* Ross Kleinstuber, *"Only A Recommendation": How Delaware Capital Sentencing Law Subverts Meaningful Deliberations and Jurors' Feelings of Responsibility*, 19 Widener L. Rev. 321 (2013).

context requires us to respect the reality that reasonable jurors and judges can come to different conclusions on the question of whether a life sentence or execution is the appropriate penalty for even a monstrous crime. Thus, the appropriate inquiry is not for the appellate panel to ask itself whether, having seen the new evidence, the panel thinks a death sentence is warranted. In fact, that sort of inquiry is inconsistent with the intuition behind this Court's recent change to Rule 82,[52] which requires that a different trial judge than originally gave a death sentence preside over any new trial and sentencing, regardless of whether the judge had handled the original case in an exemplary manner. In enacting that amendment, we recognized that it is difficult for anyone to set aside a prior decision, and that in the important matter of applying the death penalty, a defendant who is entitled to a new trial or sentencing should have that proceeding handled by a new judge who has not formed an opinion about his culpability in the past.

Thus:

> In situations where a *Strickland* violation has resulted in a failure to present mitigating evidence, the test for prejudice is whether there is a "reasonable probability" that the result of the penalty phase would have been different. "A reasonable probability is a probability sufficient to

---

[52] Supr. Ct. R. 82(b).

undermine confidence in the outcome." Although this standard is not mathematically precise, it clearly does not require that it be more likely than not that a different sentence would have resulted had the missing mitigating evidence been considered. Rather, a finding of prejudice is required if there is a substantial likelihood that a reasonable sentencing authority would have reached a different conclusion if it had the chance to consider the missing mitigating evidence. In simple, common sense terms, a reasonable probability means that there is a meaningful chance that the new evidence would have caused a reasonable sentencing authority to give a different sentence. This inquiry is an objective one that focuses on what effect the evidence could have on a reasonable sentencing authority.[53]

In other words, we must determine whether there is a meaningful chance that the evidence omitted due to the *Strickland* violation, including evidence of Sykes' severe childhood abuse, economic deprivation, and forced participation in crime by his father, could have caused a reasonable juror or sentencing judge to conclude that the balance of aggravating and mitigating factors weighed in favor of life in prison. In this case, the undiscovered evidence of horrific abuse was so different than the

---

[53] *Ploof*, 75 A. 3d 840, 874-75 (dissent) (internal citations omitted). *See also Strickland v. Washington*, 466 U.S. 668, 694-95 (1984) ("The assessment of prejudice should proceed on the assumption that the decisionmaker is reasonably, conscientiously, and impartially applying the standards that govern the decision. It should not depend on the idiosyncrasies of the particular decisionmaker, such as unusual propensities toward harshness or leniency. Although these factors may actually have entered into counsel's selection of strategies and, to that limited extent, may thus affect the performance inquiry, they are irrelevant to the prejudice inquiry.").

evidence presented to the jury and judge in the first instance that I cannot conclude that there is no reasonable probability that the new evidence would not have influenced a reasonable jury and judge's appraisal of Sykes' culpability. A reasonable juror and reasonable judge could decide that although Sykes committed a monstrous, inexcusable act, the compelling evidence that his most important role models inculcated a propensity toward deceit, violence, sexual disrespect, and callous disregard for women indicated a lesser degree of moral culpability and that Sykes deserved the comparatively more merciful sentence of natural life in prison. Supporting this conclusion is the reality that the State did not put in any evidence at the sentencing hearing that Sykes presented a danger to his captors in prison. In fact, the only evidence in the sentencing record was that Sykes had adjusted well to his confinement and was not a problematic inmate. Thus, a reasonable juror and judge could conclude that so long as Sykes served out his life in prison, he presented a low risk of further harm to anyone.

Accordingly, I would remand the case for a re-trial of the penalty phase.